JUNEAU SQUARE CORP., Wil-Ten Co., Inc., Juneau Square Services, Inc., Ralph W. Conway, Hal Bradley & Associates, Inc., Emil Bartel, Anna Bartel, Vione Perry, as Administratrix of the Estate of Thomas H. Perry, Harold C. Smith, III, as Administrator of the Estate of Harold C. Smith, Jr. and Mildred B. Smith, Jack D. Moertl and John F. Spoden, Plaintiffs,

v.

FIRST WISCONSIN NATIONAL BANK OF MILWAUKEE, First Wisconsin Development Corporation, First Wisconsin Corporation, Marshall-Michigan Company, Inc., Marshall-Wisconsin Company, Inc., Aetna Life Insurance Company and the Aetna Casualty and Surety Company, Defendants.

Civ. A. No. 72-C-533.

United States District Court, E. D. Wisconsin.

July 29, 1977.

George P. Kersten and E. Campion Kersten, Kersten & McKinnon, Milwaukee, Wis., for plaintiffs.

W. Donald McSweeney and John J. Voortman, Schiff, Hardin & Waite, Chicago, Ill., for First Wisconsin and Marshall-Michigan defendants.

James A. Urdan and William A. Stearns, Quarles & Brady, Milwaukee, Wis., for Aetna defendants.

## MEMORANDUM AND ORDER

WARREN, District Judge.

The plaintiffs commenced this civil antitrust action for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15 (1970), alleging that the defendants violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970), and section 7 of the Clayton Act, 15 U.S.C. § 18 (1970).

After four years of extensive discovery, summary judgment was granted in favor of the defendants on the claim arising under section 7 of the Clayton Act.[1] On May 3, 1976, a jury was selected and the parties proceeded to trial on the remaining claims. At the conclusion of plaintiffs' presentation of the evidence, the Court granted defendants' motions for directed verdicts on the monopoly claims.[2] The only remaining claims—the restraint of trade violations asserted under section 1 of the Sherman Act—were submitted to the jury at the close of all of the evidence. On October 1, 1976, the jury returned a verdict in favor of the plaintiffs.[3]

The cause is presently before the Court on a variety of post-trial motions. The First Wisconsin defendants and Marshall-Michigan Company, Inc. ("Marshall-Michigan") have moved for judgment notwithstanding the verdict or in the alternative, for a new trial or to amend the judgment entered on October 26, 1976.[4] The Aetna Life Insurance Company ("Aetna") and the Aetna Casualty and Surety Company have moved for the award of attorneys' fees. The plaintiffs have moved to amend the judgment and for the award of reasonable attorneys' fees as authorized under section 4 of the Clayton Act. The plaintiffs have also moved for a new trial as to Aetna if any relief is granted to the First Wisconsin defendants or Marshall-Michigan on their respective motions for judgment notwithstanding the verdict or for a new trial.[5]

In order to understand the contentions of the parties, the Court will endeavor to *highlight* the various acts and events which form the basis for the antitrust conspiracy.[6] In some respects, this presentation of the evidence emphasizes plaintiffs' theory of the case. For example, inferences which were urged by the plaintiffs will be referred to from time to time. This approach was adopted because of the nature of the motions before the Court and the fact that the jury found in favor of the plaintiffs.

## FACTS

In 1960, plaintiff Wil-Ten Co., Inc. ("Wil-Ten") embarked upon a building project in

---

1. *Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee*, Civil No. 72–533 (E.D.Wis., memorandum and order dated July 14, 1976).

2. The Court also granted the motion for a directed verdict filed in behalf of the Aetna Casualty and Surety Company. *Juneau Square Corp. v. First Wisconsin National·Bank of Milwaukee*, Civil No. 72–533 (E.D.Wis., memorandum and order dated September 30, 1976).

3. The jury found that the various First Wisconsin defendants and Marshall-Michigan Company, Inc. conspired to unreasonably restrain the trades of (1) the leasing, development, construction and operation of office rental space and (2) the financing for the development of office buildings. The Aetna Life Insurance Company was the only defendant not found to be a member of the conspiracy and judgment was duly entered in its favor.

4. The First Wisconsin defendants consist of the First Wisconsin Corporation and its wholly-owned subsidiaries, the First Wisconsin National Bank of Milwaukee, the First Wisconsin Development Corporation, and the Marshall-Wisconsin Company, Inc.

5. The plaintiffs, both individual and corporate, were engaged either directly or indirectly in the development, promotion, management, and operation of commercial real estate. The plaintiffs are the Juneau Square Corporation, Wil-Ten Co., Inc., Juneau Square Services, Inc., Ralph W. Conway, Hal Bradley & Associates, Inc., Emil Bartel, Anna Bartel, Vione Perry, as Administratrix of the Estate of Thomas H. Perry, Harold C. Smith, III, as Administrator of the Estate of Harold C. Smith, Jr. and Mildred B. Smith, Jack D. Moertl and John F. Spoden.

6. The condensation of over twelve thousand pages of transcript testimony and hundreds of exhibits proved to be a difficult task. The acts and events which are set forth in this memorandum and order are considered to be the most significant aspects of the case. In view of the importance of the motivations of the conspirators, some detail is provided in this area.

the central business district in Milwaukee, Wisconsin. The project was initially conceived as an effort to, in part, supply the office needs of the Aetna defendants.

The southwest quadrant of the Juneau Square block was ultimately selected as the location for the project. This parcel of land was considered to be ideal; the proposed project would provide prospective tenants with an excellent view of the lakefront and at the same time be within walking distance of the center of the downtown business district. The disadvantages were twofold. The present owner, the Milwaukee Redevelopment Authority, required the plaintiffs to develop the entire block as a condition of the purchase—a substantial undertaking relative to the financial strength of Wil-Ten. In addition to this problem, there were several decrepit buildings alongside the proposed construction site. Aetna was understandably not anxious to have its new premises adjacent to these buildings.

In order to accommodate the demands of both the Milwaukee Redevelopment Authority and Aetna, and the limited capital available for the project, Wil-Ten planned to develop the project in three phases.[7] Juneau Square Corporation was formed as a wholly-owned subsidiary of Wil-Ten to develop and manage the project. Construction of phase I, which was named Juneau Square South, was completed in late 1963. As phase I was nearing completion, work on Juneau Square North began. The permanent financing for both buildings was provided by Aetna.

In 1965 and 1966, additional capital was obtained. Plaintiffs Ralph W. Conway, Hal Bradley & Associates, Emil and Anna Bartel, and Thomas H. Perry each purchased interests totaling 25 percent of the existing project. Defendant Marshall-Michigan purchased another 50 percent for one million dollars and as part of the agreement, received a junior mortgage on the existing project. Sale and leaseback agreements were negotiated in each instance. Juneau Square Corporation retained operational control of the project.

Phases I and II were nearing completion by October, 1967. At this time, the plaintiffs began preparations for Juneau Square East, the third and final phase of the project. Further funds were apparently needed to complete tenant space improvements in Juneau Square North and to begin Juneau Square East. In order to temporarily accommodate these needs, Aetna agreed to a moratorium on principal payments under the loan for the permanent financing for phases I and II.

During the next year and a half, the plaintiffs proceeded with their plans for the construction of Juneau Square East. In early 1969, the basic plans and specifications were completed. By this time, however, the plaintiffs were in default under the mortgages with Aetna and Marshall-Michigan on the first two phases of the project. The plaintiffs had neglected to pay the real estate taxes on the project, a sum in the amount of $245,000.00. The cash flow from the existing project, the infusion of capital in 1965 and 1966 and the moratorium on principal payments had proven to be insufficient to both maintain the project and to proceed with the third phase.[8] At this point in time, the plaintiffs were in a precarious financial position. Unless a financing package could be arranged to permit the construction of Juneau Square East and to cure the deficiencies under the mortgages on the *existing* project, foreclosure was inevitable.

Meanwhile in late 1968, the First Wisconsin Corporation had embarked upon a program to develop a new "First Wisconsin Center" adjacent to the Juneau Square Project. This project would place approximately one million square feet of new office

---

7. The basic concept called for the development and construction of three office buildings with an underground parking structure. The three phases were respectively designated as Juneau Square South, Juneau Square North, and Juneau Square East.

8. The economic viability of the first two phases of the project was drawn into question by the defendants. The plaintiffs attributed the insufficiency of the funds to the fact that Juneau Square North and South were burdened with the development costs for the proposed construction of Juneau Square East.

space on the market.[9] Market studies indicated that the demand for new office space in Milwaukee's central business district was such that up to 200,000 square feet could be absorbed annually (PX 446, 498, 520–22, 589–91). Juneau Square East with approximately 300,000 square feet of office space was scheduled to be completed just prior to the First Wisconsin Center. It is this competitive pressure which is the underlying theory of plaintiffs' case.

The officer in charge of the development of the First Wisconsin Center was Richard Holscher. He immediately set out to assemble the land with the assistance of the Northwestern Mutual Life Insurance Company. During this period, he also investigated the possibility of acquiring adjacent parcels for expansion purposes. George Kasten, the president of the First Wisconsin Corporation, testified that he had been warned of the need for additional property for future expansion by bank presidents in Chicago and Houston who had underestimated their space requirements. (Tr. 8510–15).

One of the adjacent parcels was the property on which Juneau Square East was to be built. Holscher testified that he reviewed the credit files on Juneau Square Corporation and Wil-Ten, both customers of the First Wisconsin National Bank of Milwaukee. His stated purpose for the review was to investigate the status of the project in order to determine the availability of the property for expansion purposes. Both Kasten and Holscher denied that they were motivated to acquire the property because of the threat of potential competition from Juneau Square East.

Dickens, an employee of the bank, testified that these files were considered to be confidential and that only selected officers of the bank were permitted access to them. Holscher was not on the access list. (Tr. 7471–72) The plaintiffs argued that this deviation from bank policy and conversion of confidential credit information for the bank's own use was "illegal" in that it constituted a gross violation of the bank's duty to maintain the confidentiality and privacy of its credit files. The jury was asked to infer that this was one of the unfair methods of competition utilized by the First Wisconsin defendants as a part of the conspiracy in restraint of trade.[10]

In early March, 1969, Holscher met with David Shute, an attorney for the First Wisconsin Corporation. During this series of meetings, plans for the acquisition of the Juneau Square Project were discussed. A few days later, Shute forwarded a handwritten memorandum to an attorney in Chicago named Harold Shapiro (PX 303, 304). This memorandum directed Shapiro to contact Aetna and reads in pertinent part as follows:

5. We have reason to *believe* Aetna might like out of the situation—
   a. low rate
   b. shaky financial history of project & its developers
We understand developers have been trying to raise funds for new project from various sources, and they are apparently down to Aetna & will be filing application next week for loan for "East" project . . .

    \*    \*    \*    \*    \*    \*

6. Our strategy:
   a. As representative of interested undisclosed prin., contact Aetna for prelim. discussions. We believe best contact wd. be _____ Swinehart, who once

---

**9.** The First Wisconsin defendants planned to occupy half of the existing office space in the new First Wisconsin Center leaving approximately one-half million square feet for the public. The vacation of their existing headquarters placed an additional one-half million square feet on the market.

**10.** The plaintiffs rely upon *Milohnich v. First National Bank,* 224 So.2d 759 (Fla.App.1969), and *Peterson v. Idaho First National Bank,* 83 Idaho 578, 367 P.2d 284 (1961), to support the view that the bank acted "illegally" in this regard. Aside from the fact that there is some doubt as to the applicability of these cases, the Court is not persuaded that there is anything inherently illegal about the review of credit files by any *member* of the bank. However, the careless handling of this information could give rise to a tort or, as in the case at bar, the improper use of this information could be construed as an act in furtherance of the conspiracy.

held title of V.P. in charge of Mgages. Might start with him, see where he leads you.

\*   \*   \*   \*   \*   \*

b. Our client's int. is to purchase entire block for cash. Our knowledge of details of deal, as disclosed to Aetna, shd. be limited to what we might have been able to find out w/o "insider" info (will leave to your good judgment) We would pay fair *cash* price equal to market value.

The timing of this memorandum is significant. The memorandum notes that the plaintiffs were "down to Aetna & will be filing application next week for loan on the 'East' Project." The memorandum implicitly directs Shapiro to convince Aetna that it was in Aetna's best interests to deal with the First Wisconsin defendants rather than proceed with the financing of Juneau Square East.

Shapiro subsequently met with Aetna on March 18, 1969. Aetna indicated that they were not interested, and the matter was dropped. Aetna was not informed that the First Wisconsin Corporation was Shapiro's principal.

In the interim, the plaintiffs attempted to persuade Aetna to provide the needed financing for Juneau Square East. After some preliminary discussions, Aetna advised the plaintiffs that it would not finance East in a letter dated March 11, 1969. The plaintiffs immediately set out to obtain alternative financing.

During the next eight months, the plaintiffs attempted to obtain financing from the Metropolitan Life Insurance Company of New York ("Metropolitan"). Some delay in these negotiations resulted from plaintiffs' inability to reach an accommodation with Aetna with respect to the grant of a release as to that portion of the Aetna mortgage which covered some of the property on which Juneau Square East was to

be built. Aetna subsequently indicated some willingness to provide air rights and easements, an accommodation which was apparently acceptable to Metropolitan, and the negotiations continued.

While these negotiations were proceeding, Metropolitan contacted James Liek, an employee at the First National Bank of Milwaukee, for an opinion of the Juneau Square property and the Juneau Square developers. Liek testified that he told Metropolitan that "it was good real estate and that the only thing [he] knew about the borrowers was that they had had difficulty in making Phase 1 and 2 work out, and that they had a loan outstanding with the bank which was overdue and had been extended and that [he] assumed they were aware of that" (Tr. 5040). Liek also indicated that he was unaware of any interest on the part of the First Wisconsin defendants in acquiring the project at that time (Tr. 5036–39). There was, however, documentary evidence that Liek was at the meeting when the First Wisconsin Corporation Executive Committee granted formal authority to acquire Juneau Square (PX 458).[11]

The Metropolitan negotiations continued into early November, 1969. Warren Stringer of Dunn & Stringer made arrangements for a meeting between Metropolitan and the plaintiffs to work out any remaining difficulties and to see if some final agreement could be reached (Tr. 5,092–94). Stringer also testified that he believed that the negotiations were "moving along" at this time (Tr. 5089). Plaintiff Jack Moertl, who was participating in the negotiations, was of the opinion that agreement had been reached (Tr. 1297–1322).

Prior to any meeting with Metropolitan, a meeting which was apparently set for November 5, 1969, the plaintiffs were notified that the needed financing would not be provided. Stringer testified that he was surprised by the decision but could not remember the precise reasons given for the

---

11. Liek was apparently asked to appear at the executive committee meeting to give a report unrelated to the matters at issue in the case at bar. An employee of the bank testified that the uniform practice at such meetings was to have the person appear for the report and then de-

part immediately thereafter (Kuehl, Tr. 9294–8). There is therefore some doubt as to whether Liek was present when the committee actually discussed the acquisition of Juneau Square.

declination; he indicated that they probably were "cash flow, yield, alternative forms of investment, things of this nature." (Tr. 5095). Moertl stated that no explanation was ever given (Tr. 1324).

The testimony and contemporaneous memoranda of those responsible for the declination of plaintiffs' loan application indicate that there were several reasons for the rejection.

There were several reasons for it, we were in a very selective market at that point in time, rates were high, the mortgagee was being very selective in terms of the properties that they were underwriting and mortgaging, and, at that point in time, this property did not—the projections, our analysis indicated it was not a satisfactory mortgage or equity situation for us. (Dolan, Tr. 10,745).

In a letter to Stringer, Lane, also of Metropolitan, stated:

Unfortunately the Metropolitan cannot consider this project in today's highly restricted market. It appears that there are more attractive investments available to the company. Also, the financial analysis indicated that the investment does not produce a cash flow and yield of alternative investments. (WX 51).

Shortly after Metropolitan declined to provide the financing for Juneau Square East, the plaintiffs received another setback. Aetna commenced a foreclosure action because of plaintiffs' failure to pay the real estate taxes on the project.

After Marshall-Michigan received notice of the Aetna foreclosure, Sann and Clark, who were general counsel for the corporation in New York, came to Milwaukee with a check payable to Aetna to cure the tax default, a sum in the amount of $245,000.00. Boerema, Marshall-Michigan's managing agent for the Juneau Square project, stated that he was told by either Sann or Clark that the intention of Marshall-Michigan was to cure the tax default and reinstate the Aetna mortgage (Tr. 5310). On arrival, they conferred with Robert Bradley, local counsel for Marshall-Michigan.

Bradley knew that the First Wisconsin defendants were interested in the project.

He advised Sann and Clark of this fact and arranged for a meeting between representatives of Marshall-Michigan and the First Wisconsin defendants. At this meeting, Sann testified that he asked whether the "bank or one of its affiliate companies might want to buy our position as is, and that is to say, subject to the foreclosure action." Sann related that "Mr. Holscher did not express any interest in buying our position as is, but expressed an interest in possibly buying it after the foreclosure action had been cured." (Tr. 9860). Holscher stated his reasons for rejecting the overture from Marshall-Michigan.

I was not interested in getting involved in a foreclosure and that is the reason that I could not get together with Marshall-Michigan. They wanted to sell their interest and go through the legal problems, and I said I'm not interested in that. I'm not interested in the property. Somebody's going to have to do that. I am not going to, and I just said I will see what happens (Tr. 7,640–41).

During this period, Marshall-Michigan unsuccessfully attempted to acquire some control over the project. A letter was sent to all of the Juneau Square tenants directing them to pay rentals into a special bank rather than to Juneau Square Corporation (PX 164). Sann testified that he and Clark were of the impression that the plaintiffs had diverted funds from the existing project to Juneau Square East (Tr. 9,797–98). Marshall-Michigan, of course, had no interest in the third phase of the project. Sann stated that "the purpose [of the letter] was to accomplish what we regarded as our first task, namely to stop further diversion of rents of the existing project into new projects." (Tr. 9804). Sann also indicated that by this time, Marshall-Michigan had decided to foreclose the plaintiffs (Tr. 9819).

Sann and Clark next met with representatives of Aetna. Sann and Clark explained their predicament to Aetna.

We expressed concern about our investment, we told Aetna that we were going to institute second mortgage foreclosure proceedings, and that we were going to request the Court for the appointment of

a receiver in order to make certain that all the rent monies would be applied to their proper functions . . . (Tr. 9876).

Aetna apparently was persuaded to hold its foreclosure action in abeyance to permit Marshall-Michigan to go ahead with its plans to attempt to gain control of the project. (Tr. 9877).

Shortly thereafter, Marshall-Michigan commenced its own foreclosure action against the plaintiffs and immediately moved for the appointment of a receiver. The presiding judge refused to appoint a receiver and according to Sann, Aetna adopted the position that the agreement "was of no further existence or validity." (Tr. 9878)

The plaintiffs asked the jury to infer that Marshall-Michigan joined the conspiracy during this period. This inference was based on the following circumstances. Prior to the commencement of the Aetna foreclosure action, Marshall-Michigan had cooperated with the plaintiffs in the development of the project. When Sann and Clark came to Milwaukee their intention was to cure the tax default and reinstate the mortgage. After conferring with local counsel, a meeting was arranged with the First Wisconsin defendants. As a result of this meeting and the subsequent attempts of Marshall-Michigan to acquire control of the project set forth above, the jury was asked to infer that Marshall-Michigan joined the conspiracy in order to salvage its investment interest in the project. Knowledge of the conspiracy in restraint of trade is imputed to Marshall-Michigan because of the fact that both Marshall-Michigan and the First Wisconsin defendants were represented by the same law firm; they presumably were both fully advised of the situation before reaching agreement and Marshall-Michigan was in any event presumably aware of the competitive position of the plaintiffs and the First Wisconsin defendants.

At this point in time, the parties entered into negotiations in both foreclosure actions. The parties subsequently entered into a stipulation which provided the plaintiffs with a period of time to obtain financing for Juneau Square East. The defendants also agreed to provide the necessary air rights and easements over that portion of the property under the Aetna and Marshall-Michigan mortgages. In exchange, the defendants obtained a waiver of all defenses to the foreclosure actions, a waiver of plaintiffs' right of redemption, and the right to enter judgment after the financing deadline. That deadline was September 30, 1970.

The plaintiffs then attempted to obtain the necessary financing. Negotiations with both Cooper-Horwitz and Phillipsborn were unsuccessful.[12] Near the end of the deadline, the plaintiffs were making substantial progress with Diversified Financial Corporation of America and the Midland National Bank. A commitment was obtained shortly after the deadline passed. Difficulties, however, arose with respect to the grant of air rights by Aetna and the financing fell through.

After the deadline passed, Aetna tried to have judgment entered in accordance with the stipulation. The presiding judge refused to enter judgment and set the matter on for trial. This decision was precipitated in part because of Aetna's failure to reach some accommodation with the plaintiffs with regard to the necessary air rights. At this point in time, the parties entered into a second stipulation with a new deadline of December 31, 1971. Additional provisions were added to permit Marshall-Michigan to proceed ahead of Aetna in foreclosing the plaintiffs.

The plaintiffs now turned to the New York Life Insurance Company ("New York Life") for the necessary financing. After preliminary negotiations, the financial application was forwarded from the Chicago office to the home office with a favorable

---

12. The plaintiffs asked the jury to infer that the First Wisconsin defendant probably interfered with these negotiations because of the evidence of interference with respect to the Metropolitan and subsequent New York Life loan applications. There was no direct evidence linking the defendants with the loss of financing with either Cooper-Horwitz or Phillipsborn.

recommendation. The matter was then submitted to New York Life's Real Estate and Mortgage Loan Committee on May 5, 1971 for initial approval. If the loan committee approved the loan, the loan application would be referred to the finance committee for final approval.

There is little evidence of what occurred at the May 5 meeting. Boone, a member of the committee, stated that there was some question as to the financial strength of the Midland National Bank ("Midland"). Rather than approve or decline the loan application, the matter was withdrawn to permit further investigation (Tr. 10,918–19). Rose, another member of the committee, also indicated that the financial strength of Midland was a principal concern. He further stated that he had already made up his mind to reject the loan application (Tr. 11,-067–68). At the conclusion of the meeting, Lutz, who was the chairman of the loan committee, asked Duncan to make further inquiries as to the financial strength of Midland (Tr. 11,069).

Duncan was the treasurer of New York Life. After the May 5 meeting, he contacted Albert Little, a business acquaintance at the First Wisconsin National Bank of Milwaukee, and asked him to do a credit check.[13] Little checked the credit files at the bank and called Davey a few days later. Davey, a subordinate of Duncan, had been assigned the responsibility of following through on the credit checks. He incorporated the contents of the conversation with Little in a contemporaneous memorandum which was sent to the members of the committee (PX 404). Little testified that he had no knowledge that the First Wisconsin defendants were interested in acquiring the project. (Tr. 9532–34). There is, however, documentary evidence that a summary of the status of the Juneau Square Project was forwarded to Little at this time. The Davey memorandum reads in pertinent part as follows:

> We were told that the property has been developed in instalments and was

"bootstrapped all the way." They have a high debt. It was believed that the mortgage held by the Aetna was in trouble and the lender has agreed to defer foreclosure. Our source bank had a part in the construction lending and found proceeds were not being used as indicated. There appeared to be several recent judgments and liens against the property.

It was our source's opinion that the entire project was not adequately financed. Recent high interest rates gave them real problems.

The Midland National Bank was described as a retail oriented institution that has made reasonable progress. They took over a bank a short while ago and this accounts for a jump in deposits from $60 million to $100 million. The bank's President, Mr. Kelly, was described as a very aggressive banker who was not well liked in the local financial community. He had been with the Marine Bank where, he led a proxy fight to get control of the corporation that was largely owned by interests close to the bank for which he was working.

The plaintiffs asked the jury to infer that Little had knowledge of the conspiracy and intentionally falsified the credit report in order to interfere with plaintiffs' loan application.

The loan application was again submitted to the committee on May 19, 1971. This time the application was rejected by a vote of five to 1. The minutes of the meeting indicate that the loan was rejected because Midland was found to be unqualified (PX 388). Boone (Tr. 10,922–10,926), Rose (11,-072–76), and Lutz (Tr. 7217–22) all confirmed that this was the principal reason for the declination. Another reason given was the complexity of the transaction (Tr. 7215–19). Neither Boone nor Rose could recall whether the integrity of the developers was even brought up at the meeting. The only evidence which indicates that this may have been a factor was a subsequent

---

**13.** The plaintiffs emphasized the fact that both George Kasten, the president of the First Wisconsin Corporation, and Little were acquainted

with Duncan. The jury was asked to infer that Duncan was motivated to join the conspiracy because of this relationship.

New York Life memorandum which reads in pertinent part as follows (PX 383):

Mr. Lutz indicated:

1. Sponsors had mis-handled funds and were being foreclosed.
2. Bank was not sufficiently capitalized to handle gap funds.

The loss of the New York Life financing was followed by still another attempt to obtain financing; this time the plaintiffs directed their efforts at the Baird & Warner Real Estate Investment Trust ("REIT"). By late December, 1971, the parties were nearing agreement. Because of the approach of the financing deadline, the plaintiffs sought and obtained an extension from Aetna at a meeting on December 20, 1971. Aetna, however, conditioned its agreement on the acquiescence of Marshall-Michigan.

Sann testified that during this period, he maintained the position that no extension would be granted by Marshall-Michigan unless agreement was reached with REIT by the end of the year (Tr. 9886). Krauss of Baird & Warner, who discussed the matter with Sann indicated that Sann agreed to postpone the entry of judgment to permit further negotiations with REIT (Tr. 12,695–96). Sann denied ever making such an agreement (Tr. 9885–86).

The plaintiffs failed to reach agreement with REIT by the December 31, 1971 deadline. Marshall-Michigan entered judgment pursuant to the stipulation between the parties on January 3, 1972. Aetna followed on January 4, 1972, and the REIT financing fell through. Marshall-Michigan purchased the property for a nominal sum at a sheriff's sale held on February 28, 1972. The property was, of course, purchased subject to the Aetna mortgage. Marshall-Michigan subsequently sold its interest in the project to Marshall-Wisconsin Company, Inc., a subsidiary of the First Wisconsin Corporation. Marshall-Wisconsin proceeded to reach an agreement with Aetna which, *inter alia,* established a new mortgagor-mortgagee relationship. The First Wisconsin defendants thereby obtained control of the Juneau Square Project.

## I.

The gravamen of the complaint is that the defendants, through the use of unfair methods of competition, conspired to eliminate the plaintiffs as competitors in the rental of office space in downtown Milwaukee. As a result of the conspiracy, the defendants acquired the existing Juneau Square Project and thereby prevented the construction of Juneau Square East. The jury found that the defendants conspired to unreasonably restrain competition and the defendants now urge the Court to set aside that verdict. The Court will first consider defendants' motions for judgment notwithstanding the verdict.

A motion for judgment notwithstanding the verdict is in effect a renewal of the motion for a directed verdict made at the close of the evidence. In each instance, the Court is obligated to view the evidence and all reasonable inferences in the light most favorable to the plaintiffs. *Continental Co. v. Union Carbine,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); 9 Wright & Miller Fed.Prac. & Pro. § 2537 at 596 (1971); 5A Moore's Fed.Prac. ¶ 50.7[2] at 2356 (1966). Both motions are properly denied "[when] the evidence is such that reasonable men in a fair and impartial exercise of their judgment may draw different conclusions therefrom." *Hannigan v. Sears, Roebuck and Co.,* 410 F.2d 285, 287 (7th Cir. 1969).

Notwithstanding the foregoing, it is clear that more than a mere "scintilla of evidence" is required. *Gunning v. Cooley,* 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930); *Hubert v. May,* 292 F.2d 239 (7th Cir. 1961). Accordingly, the defendants are not required to show that there is a total absence of any evidence on the claims at issue but only that there is *insufficient* evidence upon which reasonable men could properly base a verdict.

The sufficiency of the evidence is challenged in two respects. The defendants first contend that the plaintiffs failed to establish the existence of a contract, combination, or conspiracy either to attain an illegal end or to attain a legal end by the use of illegal means.

The position of the defendants may be summarized as follows. There is no evidence of anticompetitive motivation on the part of the defendants. The only evidence in the record on this subject indicates that Marshall-Michigan and Aetna were concerned with protecting their investment interests, and the First Wisconsin defendants were only concerned with acquiring the property for expansion purposes. Accordingly, the legality of the "end" of the conspiracy—the acquisition of Juneau Square—is beyond dispute. Once this characterization of the evidence is adopted, the defendants proceed to isolate each of the various acts and agreements between the parties and demonstrate their legality. The only acts which could in any way be construed as being illegal are viewed as being attributable to the First Wisconsin defendants. Assuming for the sake of argument that the jury found some of these acts to be illegal, there is no evidence that Marshall-Michigan or any other non-First Wisconsin defendant acted illegally or took steps to implement a conspiracy with knowledge that illegal means were being employed.

■ In reviewing the evidence, the Court has consistently adopted the position that the plaintiffs need not establish that each act was illegal. It is only necessary that the acts whether legal or illegal be in furtherance of a common plan or conspiracy in restraint of trade. *American Tobacco Co. v. United States,* 147 F.2d 93 (6th Cir. 1944), *aff'd,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Schulman v. Burlington Industries, Inc.,* 255 F.Supp. 847 (S.D.N.Y.1966). The significant issue in this respect is whether the defendants were motivated to restrain competition. That motivation may be inferred from the character and effect of the conspiracy. The fact that a particular act or agreement is legal or illegal is of little consequence unless when viewed in the context of the conspiracy, it tends to prove that the defendants were motivated to restrain competition. Accordingly, all of the circumstances surrounding the conspiracy must be taken into consideration. *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Ramsey v.*

*United Mine Workers of America,* 265 F.Supp. 388 (E.D.Tenn.1967), *aff'd,* 416 F.2d 655 (6th Cir. 1967), *reversed on other grounds,* 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).

■ With these considerations in mind, the Court has carefully weighed the evidence and is of the opinion that there is sufficient evidence to support the finding of the jury. Much of the evidence is admittedly of a circumstantial nature. Great emphasis has been placed on the nature, timing, and sequence of the various acts which form the basis for the anti-trust conspiracy. This has given rise to considerable disagreement as to the inferences to be drawn from the evidence.

The defendants' position is premised in large part upon the assertion that the objective of the conspiracy was legal. The plaintiffs adopted a contrary position; the objective of the conspiracy was the elimination of competition. While there is evidence that the First Wisconsin defendants merely desired the property for future expansion purposes, the surrounding circumstances and activities of the various conspirators indicate another possible motivation. The jury was aware of the fact that Juneau Square East was in a position to assert competitive pressure on the new First Wisconsin Center. The evidence indicated that the only real competition in the area for "first class" office space consisted of the MGIC Plaza and the First Federal Plaza. The size and location of Juneau Square East would have undoubtedly altered this situation.

The jury was also confronted with the extensive efforts made in behalf of the First Wisconsin defendants, including, *inter alia,* the early Shute-Shapiro effort, the extensive and varied negotiations over the years with Aetna and Marshall-Michigan, and the Little credit report. The timing and nature of these efforts are significant. For example, the Shute memorandum establishes the intent of the First Wisconsin defendants to take over the *entire* block; and reveals detailed knowledge of plaintiffs' financial situation, the proposed construction of Juneau Square East, and plain-

tiffs' need for further financing. The memorandum notes that the plaintiffs were "down to Aetna & will be filing application next week for loan on the 'East' project" and implicitly directs Shapiro to convince Aetna that it was in Aetna's best interests to deal with the First Wisconsin defendants rather than proceed with the financing of Juneau Square East.

The jury was asked to believe that these extensive maneuverings were motivated by some unknown expansion need in the distant future. In rejecting this view of the evidence, the jury obviously weighed the circumstantial nature of much of the evidence proffered by the plaintiffs and found it to be more persuasive than the explanations of the First Wisconsin defendants. The apparent inconsistencies in the testimony of certain witnesses probably played a key role in this decision.[14] In weighing the evidence in the light most favorable to the plaintiffs, particularly the credibility of the various witnesses, the Court is unable to say that there is no support in the record for the verdict of the jury as to the First Wisconsin defendants.

The evidence of Marshall-Michigan's role in the conspiracy is more troublesome. There is no doubt that Marshall-Michigan was motivated to oust the plaintiffs from the project. The project was in a precarious financial position and Marshall-Michigan was in a position to suffer a substantial business loss. The First Wisconsin defendants provided an obvious solution to this dilemma. The evidence clearly indicates that Marshall-Michigan assisted the First Wisconsin defendants in the acquisition of the project. The difficult question is whether this defendant "knowingly" participated in a conspiracy in restraint of trade.

The evidence indicates that Marshall-Michigan cooperated with the plaintiffs until a series of contacts occurred with the First Wisconsin defendants. It is significant that both Marshall-Michigan and the First Wisconsin defendants were represented by attorneys from the same law firm.

These attorneys arranged the meetings and were instrumental in the various negotiations which ultimately led to the acquisition of the Juneau Square Project. These same attorneys were also intimately aware of the respective positions of both parties. Both were clients of the firm and were in a position to gain from the elimination of the plaintiffs. As the parties were not in an adversary position but were cooperating in this regard, it is logical to assume that they were fully advised of the situation before reaching any agreement, if in fact an agreement was reached.

The subsequent actions of Marshall-Michigan tend to support this view. Marshall-Michigan was not only not cooperating, it was doing its best to eliminate the plaintiffs. Those actions included the commencement of a foreclosure action and an attempt to interfere with the rental payments of the project. Once the plaintiffs were ousted from the project, Marshall-Michigan promptly sold its interest to the First Wisconsin defendants.

The Court is not unaware of the fact that the various witnesses for Marshall-Michigan denied that they had participated in a conspiracy to eliminate competition. The jury obviously attributed little weight to these denials and found the circumstantial evidence to be more persuasive. The Court is not in a position to say that these denials were so persuasive as to warrant judgment notwithstanding the verdict.

The sufficiency of the evidence is challenged in another respect. The defendants contend that there is little or no evidence of injury or prejudice to the public interest and without such proof, it is asserted that the plaintiffs failed to prove that the conspiracy resulted in an unreasonable restraint of trade.

It is well settled that although section 1 of the Sherman Act prohibits "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States," only those contracts, combinations, or conspiracies which are

---

14. There were varying explanations and apparent inconsistencies surrounding the Shute memorandum and the Little credit report. These were probably the two most significant aspects of the case.

found to *unreasonably* restrain competition are prohibited by the Act. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910); *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1910). Some proof of the unreasonableness of the restraint is therefore necessary to distinguish those restraints which are incidental or ancillary to normal business transactions.

■ The burden of proof in this regard depends on the nature of the anticompetitive conduct employed by the alleged violations of the Act. Certain practices such as price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); market allocation, *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); concerted refusals to deal (group boycotts), *Fashion Originators' Guild v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); and some tying arrangements, *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); are considered to be so inherently anticompetitive that they are deemed to be *per se* illegal. No further inquiry into the reasonableness of the restraint is required. The Court, however, has never adopted the position that a *per se* violation occurred in the case at bar.[15]

In cases involving conduct which is not inherently anticompetitive, proof of the unreasonableness of the restraint is required to establish a violation of the Act. The reasonableness of any restraint invariably involves questions of relation and degree and an inquiry into, *inter alia,* the particular business, the nature of the restraint and its effect, the reason for the restraint, and the purpose or end to be obtained thereby. *Sugar Institute, Inc. v. United States,* 297

U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

As a part of the proof of the unreasonableness of the restraint, there is at present some disagreement as to whether any proof of public injury is required. It is of course clear that proof of public injury is not required in cases involving *per se* violations of the Act. *Continental Co. v. Union Carbide,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Radiant Burners, Inc. v. Peoples Gas & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The disagreement arises with respect to non-*per se* cases. *See, e. g., Syracuse Broadcasting Corp. v. Newhouse,* 295 F.2d 269 (2nd Cir. 1961) (Public injury not required). *Contra, Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690 (5th Cir. 1975); *Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506 (6th Cir. 1972).

This disagreement has resulted from certain language in *Radiant Burners* and dictum in *In Re McConnell,* 370 U.S. 230, 231, 82 S.Ct. 1288, 1290, 8 L.Ed.2d 434 (1962), to the effect that "the right of recovery of a plaintiff in a treble damage antitrust case does not depend at all on proving an economic injury to the public." *See, also, Switzer Brothers, Inc. v. Locklin,* 297 F.2d 39, 47 (7th Cir. 1961).

■ An analysis of this limited and somewhat unclear authority on the subject persuades the Court that in cases involving non-*per se* violations of the Act, the private litigant must at the very least prove that restraint "tends or is reasonably calculated to prejudice the public interest." *Rogers v. Douglas Tobacco Board of Trade,* 266 F.2d

---

**15.** Two *per se* theories were advanced by the plaintiffs. The plaintiffs first urged the Court to adopt the theory first announced in *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir. 1932), to the effect that a conspiracy to destroy a competitor through the use of unfair methods of competition is a *per se* violation of the Sherman Act. This theory has never been approved by the Supreme Court, nor has it gained acceptance in most circuits. In fact, there is some doubt as to whether it is

still good law in the First Circuit. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974). This Court is of the opinion that the reasonableness of the restraint should be submitted to the jury in such circumstances.

The plaintiffs also argued that a *per se* illegal boycott was involved in the case at bar. There is no evidence in the record to support this theory.

636, 644 (5th Cir. 1959). Both *Radiant Burners* and *Klor's,* the principal authority relied upon by opponents to the public injury requirement, involved *per se* violations. In both instances, the Court, while not expressly relying upon the *per se* distinction, emphasized the nature of the restraint employed in each case.

The Court [in *Standard Oil Co. v. United States,* supra] recognized that there were some agreements whose validity depended on the surrounding circumstances. It emphasized, however, that there were *classes of restraints* which from their "nature or character" were unduly restrictive, and hence forbidden by both the common law and the statute. 221 U.S. at 58, 65 [31 S.Ct. [502] at 515]. *As to these classes of restraints,* the Court noted, Congress had determined its own criteria of public harm and it was not for the courts to decide whether in an individual case injury had actually occurred. Id., at 63–68 [31 S.Ct. [502] at 517–518–519].

Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. (footnotes omitted) *Klor's,* supra, 359 U.S. at 211–212, 79 S.Ct. at 709 (emphasis added).

Similar language is found in *Radiant Burners, supra,* 364 U.S. at 659–660, 81 S.Ct. 365. A reading of both cases indicates that public harm is presumed in those classes of restraints which are by their nature unduly restrictive. The Court has typically reserved such language for those restraints which are considered to be *per se* unreasonable.

This view is supported by the Court's subsequent decision in *Continental Co. v. Union Carbide, supra.* In that case, the Court distinguished *per se* violations of the Act.

An error committed by the trial court, perhaps understandable because the trial preceded this Court's decision in *Klor's, Inc., v. Broadway-Hale Stores, Inc.,* 359 U.S. 207 [79 S.Ct. 705, 3 L.Ed.2d 741], was the "public injury" charge. Although petitioners pleaded a concerted refusal to deal with them by respondents, a price-fixing conspiracy, and an allocation of customers, *all per se violations under § 1 of the Sherman Act,* the court charged the jury that a conspiracy must be proved "which was reasonably calculated to prejudice the public interest by unduly" restraining trade, and which was intended "to injure the general public by" restraining trade. Under the rule stated in *Klor's* this charge was error. Id., 370 U.S. at 708, 82 S.Ct. at 1415. (emphasis added)

In view of the *per se* distinction drawn in *Continental Co.* and the apparent rationale of both *Klor's* and *Radiant Burners,* the Court is unable to find any basis for the conclusion that proof of public injury is no longer required in cases involving non-*per se* violations of the Act.

The Second Circuit Court of Appeals is the only higher court to expressly eliminate the requirement of proof of public injury in a non-*per se* case. That decision relied upon *Radiant Burners* without further elaboration. *Syracuse Broadcasting Corporation, supra,* at 276–277. While similar language is found in *Switzer Brothers,* a decision rendered prior to *Continental Co.,* the Seventh Circuit Court of Appeals was confronted with *per se* violations of the Act, and the applicability of *Radiant Burners* was clear. 297 F.2d at 47. The Seventh Circuit has not addressed the issue in a case involving a non-*per se* violation of the Act. These decisions to the extent that they hold or indicate that *Radiant Burners* should be applied in the non-*per se* case are not persuasive.

■ As the Court understands it, the parties concede that proof of specific public injury is not required. The plaintiffs need only show that the restraint "tends or is reasonably calculated to prejudice the public interest." *Rogers, supra,* at 644. With respect to the trade of office rental space, the plaintiffs offered evidence to the effect that the defendants conspired to eliminate them as potential competitors. The defendants denied that they were so motivated, but the jury has found to the contrary. The Court, as noted above, has reviewed the evidence and is unable to say that this finding was erroneous as a matter of law.

■ The evidence also revealed: that the elimination of the plaintiffs placed 142,000 square feet of office rental space in the hands of the defendants and prevented the construction of an additional 300,000 square feet; that because of the location and quality of the office space possessed by defendants, the only real competition east of the river was the MGIC Plaza and the First Federal Plaza; that the rates subsequently set by the defendants were based on the limited competition in that area; and that Juneau Square East with more available office space than both the MGIC Plaza and The First Federal Plaza combined and its choice location would have been in a position to compete with the defendants. From this evidence, the jury could have inferred that as a result of the elimination of the plaintiffs and the interference with free and open competition, the defendants were able to charge higher rates for the rental of their office space. Although there is evidence to the contrary, there is at least some evidence that the restraint tended or was reasonably calculated to prejudice the public interest.

It is doubtful whether the jury actually considered this matter in arriving at its verdict. While the jury was instructed that the plaintiffs must prove that the conspiracy resulted in an unreasonable restraint of trade, no reference was made to the requirement that there be some proof of public injury. In light of the complexity of the instant case and the importance of this issue, the Court should have provided further clarification for the jury.[16]

■ There is, however, no evidence of public injury with respect to the trade of "interstate finance." In fact, there is no evidence that the defendants even conspired to restrain this trade. It is readily apparent that the plaintiffs confused the means employed by the defendants—the interference with plaintiffs' efforts to obtain financing—with the end of the conspiracy which even under plaintiffs' theory of the case was the elimination of competition in

the rental of office space. Defendants' motion for judgment notwithstanding the verdict must therefore be granted as to the claim that the defendants conspired to interfere with the trade of interstate finance.

## II.

■ The defendants advance several contentions in support of the motion for a new trial. It is urged that the verdict is against the weight of the evidence; that the damages awarded by the jury are excessive; and that prejudicial errors were committed by the Court and by plaintiffs' counsel.

The legal standards applicable to a motion for a new trial are unlike those for a directed verdict or for judgment notwithstanding the verdict. As explained in *Simpson v. Skelly Oil Co.,* 371 F.2d 563, 570 (8th Cir. 1967):

> Thus, the case should be examined, not in the light most favorable to the plaintiff, but according to the analysis and appraisal by the trial court of the weight of all the evidence considering also any other relevant factors. *Williams v. Nichols,* 266 F.2d 389, 393 (4th Cir. 1959).

Aside from the weight of the evidence, other factors to be considered are the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles. The matter is ultimately within the sound discretion of the Court and as stated in 6A Moore's Fed.Prac. ¶ 59.08[5] at 59–160 (1971):

> The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

A review of the evidence reveals that the existence of the conspiracy is predicated in large part upon the various efforts on the part of the First Wisconsin defendants to somehow interfere with the financing for Juneau Square East. Without these overt acts, the conspiracy makes little sense in light of the fact that both Aetna and Marshall-Michigan granted two extensions to

---

**16.** The complexity of the evidence and the legal issues are discussed in part II of this memorandum and order. The Court's failure to instruct

on the issue of public injury was taken into consideration in ruling on the motions for a new trial.

the plaintiffs in order to permit them to salvage the project. The theory is presumably that Marshall-Michigan granted the extensions with the knowledge that the First Wisconsin defendants would then interfere with any attempt to obtain the needed financing.

The circumstances surrounding the various loan transactions were set forth in some detail at the beginning of this memorandum and order. The only loan transactions which are in any way linked to the First Wisconsin defendants are those involving Metropolitan and New York Life. It is significant that in both instances, the contact was initiated by the prospective lender and not the First Wisconsin defendants. It is also significant that no witness from either Metropolitan or New York Life gave *any* indication that they were pressured by the First Wisconsin defendants to decline plaintiffs' loan application.

With regard to the Metropolitan loan application, the weight of the evidence including the testimony and contemporaneous documents of all of the individuals responsible for the loan decision, is that the Liek contact had absolutely no effect on Metropolitan. Moreover, there is no indication that anything that Liek said was inaccurate and every indication that there were substantial business reasons for the declination. The plaintiffs in large part relied upon the Little contact and the subsequent loss of financing with New York Life in asking the jury to infer that the same thing occurred with Metropolitan.

This leaves the circumstances surrounding the Little contact as the most significant and the most damaging evidence of the existence of a conspiracy. Those circumstances indicate that: (1) the loan application was forwarded to the home office of New York Life with a favorable recommendation; (2) the matter came before the loan committee on May 5, 1971 but was withdrawn to permit further investigation into the financial strength of the participating bank; (3) Duncan then contacted Albert Little of the First Wisconsin for a credit check; (4) Little responded a few days later with a telephone call to Davey; (5) Davey made contemporaneous notes of the conver-

sation in the form of a memorandum which was forwarded to all of the members of the committee; (6) the committee met again on May 19, 1971 and the loan application was rejected by a vote of 5–1; and (7) the principal reason for the declination as testified to by members of the committee and as documented by the contemporaneous minutes of the meeting was that the participating bank was found to be unqualified.

There were two principal areas of contention surrounding the loss of financing with New York Life. The first was the accuracy of the Davey memorandum which purported to incorporate the substance of a conversation with Little. The second was the impact of the report on the loan committee. With respect to the accuracy of the report, there was considerable disagreement as to the contents as well as to whether Davey accurately recorded the conversation. Little, Lett, and Dickens all gave varying explanations for Little's reference to the possible diversion of funds by the plaintiffs. These explanations were confusing and at times inconsistent. There is little or no evidence that the plaintiffs actually diverted any funds without the knowledge of the bank. It would appear that the entire matter was fabricated or that some misunderstanding or possible failure of communication occurred between the parties. Little significance was apparently attached to this alleged diversion because the bank subsequently went on to loan substantial sums of money to these same plaintiffs. Of significance at this point on the issue of intent is whether Little actually *believed,* however inaccurate, that the plaintiffs had diverted funds and not whether the plaintiffs had, in fact, previously diverted funds.

Aside from this confusion surrounding the intent and knowledge of Little at the time the report was made, there is considerable disagreement as to the *impact,* if any, that the report had on the loan committee. The testimony of the loan committee members was that the declination was based on the insufficient size of the participating bank. In fact the weight of the evidence indicates that the possible mishandling of funds was not a factor in the loan rejection. Some of the members of the committee

could not recall whether the mishandling of funds was even discussed at the meeting. The overwhelming evidence indicated that the concern of the committee was the Midland bank. The fact that one of the committee members voted *against* the rejection also indicates that the integrity of the Juneau Square developers was not challenged. If the credit report was as devastating as suggested by the plaintiffs, it is logical to presume that the vote would have been unanimous.

The only evidence to the contrary is a subsequent memorandum which lists the mishandling of funds as one of two reasons for the loan rejection (PX 383). Lutz is the apparent source of this information. Lutz, however, testified that the reasons for the committee's decision were the complexity of the transaction and the financial strength of Midland.

The weight of the evidence is not the only matter of concern with respect to the loss of the New York Life loan application. In two instances the Court permitted the plaintiffs to introduce hearsay evidence of a prejudicial nature. The first instance occurred while plaintiff Jack Moertl was on the stand. Moertl was permitted to testify about a conversation he had with Jack Cisco, an employee at Baird & Warner. Cisco purportedly stated the following:

> Your New York Life financing is dead. It has been shot down. . . . Someone has given a credit report to New York Life Insurance Company that typifies you as crooks. We are told that we could just as well have sent Al Capone for a loan to New York.

When Moertl asked Cisco to explain what he meant, Cisco replied:

> Moertl, if you can't kill a project, you kill the developers. . . . [You] and Mr. Spoden have been painted as crooks and . . . the financing is dead (Tr. 1779–80).

Moertl then asked Cisco where this report came from.

> You should know full well where it came from. It came from the outfit that is building a building next door to you, the

First Wisconsin Bank of Milwaukee. (Tr. 1781)

The Court admitted this testimony over the strenuous objections of the defendants upon the ground that it was not admitted for the truth of the matters asserted therein (Tr. 1775). The Court erred in this regard.

The impact of Little's contact with New York Life as noted above is a pivotal issue in the case. Moertl was in effect permitted to characterize a conversation with Cisco who was repeating a conversation that he had had with some unidentified source. There is no indication that Cisco or the person who related the story to him had personal knowledge of the contents or the impact of the Davey memorandum. Several levels of hearsay are clearly involved.

Although not admitted for the truth of the matters asserted therein, plaintiffs' counsel repeatedly emphasized this "characterization" of the evidence. For example, the cross-examination of Holscher elicited the following questions (Tr. 7760–7762):

Q. That's a sophisticated way of a sophisticated banker telling a lender off in New York these people are crooks isn't it?

  *   *   *   *   *   *

Q. Isn't it a fact, Mr. Holscher, that it takes quite a bit of thought to draft a report that can kill a project by killing the developers in the eyes of the lender and still hope to avoid libels and slanders, takes a lot of work, doesn't it?

And the cross-examination of Little elicited the following question (Tr. 9597):

Q. That is a very sophisticated way of killing a loan, isn't it, Mr. Little, isn't it?

This hearsay testimony was at odds with the weight of the evidence and played a significant role in plaintiffs' attempt to establish the existence of a conspiracy. The Court is therefore unable to say that its admission was harmless error.

The second instance of hearsay evidence of a prejudicial nature occurred when the Court permitted the plaintiffs to introduce the Lutz-Duncan memorandum of May 21, 1971, into evidence (PX 408). This memo-

randum was relied upon to support plaintiffs' theory that the First Wisconsin defendants were attempting to interfere with the New York Life loan application. The memorandum is several levels of hearsay and reads in pertinent part as follows:

> I learned from Regional Officer Wilford that he had a discussion with Baird & Warner regarding our declination of the subject case. He was told by our correspondent that they had been called by the First Wisconsin Bank, apparently to determine whether the applicants, or anyone associated with them, had any "clout" with New York Life.
>
> They apparently made it clear to Baird & Warner that they didn't want this building built—apparently because it would interfere with the timing of the leasing in their proposed building. Our correspondent conveyed to Joe Wilford the feeling that there were veiled intimidations along the lines that First Wisconsin would use their best efforts to delay or interfere with the construction of this building.

The memorandum was admitted under the business records exception to the hearsay rule. Fed.R.Ev. 803(6). This rule states that such records are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." The lack of trustworthiness and the prejudicial nature of this memorandum are self-evident.[17]

Of equal concern to the Court is the overall setting of the trial and the complexity of the evidence and the legal principles submitted to the jury. The plaintiffs were permitted to proceed at their own pace; the presentation of plaintiffs' case lasted for thirteen weeks. During this period, the jury was inundated with numerous exhibits and extensive testimony of a background nature. The plaintiffs did not reach the relevant period—the period of the actual conspiracy—until the second or third week of trial.[18] The plaintiffs had originally led the Court to believe that the entire trial would last four to six weeks.

By the time the plaintiffs rested, the Court's trial calendar was in shambles. All the trials previously scheduled for the summer and early fall had to be canceled. Of particular concern was the backlog of criminal trials. In order to comply with the dictates of the Speedy Trial Act, the Court was forced to establish time limitations. As a result, the defendants were pressured to complete their respective cases in little more than three weeks. The impact of this unfortunate set of circumstances on the jury and the defendants cannot be lightly dismissed.[19] A new trial with reasonable time limitations on all parties would obviate this problem.

---

17. After drafting this initial memorandum, Lutz investigated the matter and concluded that:

> The proposed joint venture and mortgage loan involving Juneau Square and Midland National Bank in Milwaukee resulted in some alleged statements being made by Dick Krause to our Manager Faulkner who quite properly relayed them to Regional Officer Wilford who referred them to the Home Office. The matter was serious enough to warrant checking the information out with Mr. Krause. This resulted in a conference call involving Fred Duncan and myself, during which call Mr. Krause said there was a misunderstanding—*that the two officers of First Wisconsin Bank were simply interested in knowing whether the applicants were actually seeking a loan*, etc., etc. (PX 406) (emphasis added).

18. The absence of any semblance of a final pretrial report also contributed to the length of the trial. The Court was unable to obtain a stipulation of uncontested facts or a reasonable statement of the contested issues in the case. The parties will be ordered to meet and prepare an acceptable report prior to the second trial.

19. The Court has considerable discretion with respect to the imposition of time limitations under Rule 611 of the Federal Rules of Evidence.

> (a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

The only regret that the Court has is that reasonable time limitations were not established at the outset of the trial.

During the lengthy presentation of plaintiffs' case, the jury was confronted with an incredibly complex set of circumstances spanning the better part of ten years. Much of the testimony and the various exhibits involved large scale commercial loan transactions and the legal maneuvers of the parties in two foreclosure actions. This complexity was compounded by the fact that evidence was offered under a variety of legal theories. The plaintiffs sought to establish that the defendants monopolized office space and conspired to restrain the trades of downtown commercial office space *and* interstate finance.

At the close of the evidence, the jury was asked to weigh this incredibly complex set of circumstances and apply it to the two legal theories advanced by the plaintiffs under section 1 of the Sherman Act. While antitrust actions tend to be by their very nature somewhat complex, the instant case was complicated by the limited evidence of anticompetitive impact and motive on the part of the various defendants. The Sherman Act is directed at unreasonable restraints on competition and is not a panacea for all wrongs. *Cf. Harrison v. Prather,* 435 F.2d 1168 (5th Cir. 1970). In view of the complexity of the evidence and the legal principles, the possibility of jury confusion cannot be dismissed as idle speculation. A new trial limited to the single restraint of trade claim would remove much of this confusion.

Further confusion resulted from plaintiffs' proof of damages. The case was tried on the theory that the "project" was injured by the antitrust conspiracy. The plaintiffs were of the opinion that it was of no concern to the defendants how the money was divided by the various parties in interest. The difficulty with this view is that the project is of no legal significance and is not a person within the meaning of section 4 of the Clayton Act. In order to recover, each plaintiff is required to prove that he was injured by the antitrust conspiracy. The defendants are entitled to challenge the standing, causation, and amount of damages awarded to each plaintiff. If there was no factual dispute in any of these areas, the plaintiffs should have

moved for a court determination of the issue prior to submission to the jury.

In any event, after having heard the evidence from a project viewpoint, the jury was suddenly confronted with a series of questions as to the damages suffered by each plaintiff. In closing argument, plaintiffs' counsel attempted to cure this deficiency by urging the jury to award nominal damages to each of the individual plaintiffs. Although the jury acquiesced in this request, the possibility of duplication and confusion remains. A new trial will eliminate this problem.

The damage claims of Wil-Ten are also somewhat vague and confusing. It is readily apparent that the wrongful elimination of competition can result in injuries to shareholders, creditors, or officers and employees of the injured corporation or to business entities which depend on the business of the injured corporation. Section 4 of the Clayton Act has traditionally been construed to deny standing to these parties upon the ground that they are not within the "target area" of the conspiracy, *i. e.,* their injuries are considered to be remote or derivative in nature in the sense that they occur as a result of the fact that another party was directly injured by the conspiracy. *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2nd Cir. 1971); *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190 (9th Cir. 1964); *General Bev. Sales Co.-Oshkosh v. East Side Winery,* 396 F.Supp. 590 (E.D. Wis.1975).

Wil-Ten's damage claims are in large part supported by the testimony of Jack Moertl. Moertl stated that the business operations of Wil-Ten came to a halt after the filing of the Aetna foreclosure (T. 2547); that this interruption resulted from the fact that the management of Wil-Ten became completely absorbed in the problems of the Juneau Square Project (T. 2547–2548, 2806); that the cash flow from Wil-Ten was diverted to keep the Juneau Square Corporation going (Tr. 2550); and that the credibility and credit worthiness of Wil-Ten were destroyed by the loss of the project (Tr. 2547–2551).

While judicial delineation of the target area and its application to a particular set of facts is not always an easy task, *Congress Building Corp. v. Loew's, Incorporated*, 246 F.2d 587 (7th Cir. 1957), Wil-Ten's damage claims appear to be remote or derivative in nature. To the extent that Wil-Ten advanced funds to Juneau Square Corporation, it is in the position of any other creditor to the injured party. The other injuries result from the fact that a "subsidiary" of Wil-Ten was the target of a conspiracy. Any injury to a project in Minneapolis, for example, would clearly be outside of that target area.

Aside from its position as a parent corporation, a position which would appear to be insufficient to confer standing, there is some confusion on the Court's part as to the interest of Wil-Ten in the Juneau Square Project. Wil-Ten argues that it was a co-developer and an operating lessee. There is some doubt on the Court's part as to whether either of these interests is sufficient to confer standing. The term "co-developer" is of dubious legal significance. Rather than grant judgment notwithstanding the verdict, the Court will permit the parties to address this issue prior to the second trial. For purposes of the instant motion, it is apparent that the Court erroneously permitted the introduction of much of the evidence with respect to the damage claims of Wil-Ten.

Other factors such as possible jury misconduct and the colorful argumentation of plaintiffs' counsel were also taken into consideration. In the final analysis, the Court is persuaded that all of these factors affected the deliberations of the jury and resulted in a miscarriage of justice. The Court is not unmindful of the time and effort expended by the plaintiffs or of the cost of a second trial, but these considerations must give way if justice is to be served. The defendants are also entitled to have their day in Court. For the reasons stated above, the motions of the First Wisconsin defendants and Marshall-Michigan for a new trial must be granted.

In light of the foregoing, there is no need to address the various motions which seek to amend the judgment or plaintiffs' motion for attorneys' fees. The only remaining matters before the Court are plaintiffs' motion for a new trial as to Aetna and Aetna's motion for the award of attorneys' fees.

### III.

At the close of plaintiffs' case, Aetna moved for a directed verdict. At that time, the Court thoroughly reviewed the evidence in the light most favorable to the plaintiffs and concluded, with some reservation, that the plaintiffs had established a prima facie case.[20] In reaching this conclusion, the Court noted the highly circumstantial nature of plaintiffs' proof and that: (1) the record did not contain evidence of a *single* communication between Aetna and the First Wisconsin defendants during the relevant period, much less an agreement to restrain competition; (2) although Aetna may have had every intention of financing the third phase of the project and may have represented this fact to the plaintiffs, there were substantial business justifications for Aetna's subsequent refusal to continue the project; (3) there was no evidence indicating that Aetna was even aware of First Wisconsin's interest in the project during much of the relevant period; (4) Aetna agreed to two extensions which permitted the plaintiffs an opportunity to salvage the project; (5) and there was no evidence linking Aetna with the Liek or Little credit reports or any other purported attempt to interfere with the financing of Juneau Square East.

In light of the foregoing, the plaintiffs are hardly in a position to argue that as to Aetna the verdict is against the weight of the evidence. Moreover, the Court's decision to grant a new trial as to the remaining defendants was in large part based on certain prejudicial rulings of the Court, the weight of the evidence with respect to the interference with the various loan applications, and the fact that the defendants were pressed to shorten their presentation.

---

**20.** See, footnote 2, supra.

These factors, if anything, were also prejudicial to Aetna.

The Court is aware of the fact that the parties have not briefed this motion. The evidence and the contentions of the parties were, however, thoroughly briefed at the conclusion of plaintiffs' case. In view of the weight of the evidence in support of the verdict, there is little cause to explore the matter any further. For the reasons set forth above, the Court is of the opinion that plaintiffs' motion for a new trial must be DENIED.

## IV.

After the verdict was returned, Aetna moved for the award of attorneys' fees upon the ground that the action was brought and prosecuted in bad faith. Aetna relies on the inherent power of the Court to award attorneys' fees to a successful party when that party's opponent has acted "in bad faith, vexatiously, wantonly or for oppressive reasons." *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). *See, also, Walker v. Columbia Broadcasting System*, 443 F.2d 33 (7th Cir. 1971).

▆ At the outset, it should be noted that there is some doubt as to whether the Court has the power to award attorneys' fees to a prevailing defendant in an antitrust action. In *Byram Concretanks, Inc. v. Warren Concrete Prod. Co. of N.J.*, 374 F.2d 649, 651 (3rd Cir. 1967), the Court noted the danger in adopting such a policy.

> We hold that in the absence of specific legislative authorization attorneys' fees may not be awarded to defendants in private antitrust litigation. Our conclusion is based on policy considerations reflected in the Clayton Act. It is well known that a primary objective of the private treble damage suit is to provide a means for enforcement of the antitrust laws in addition to Government prosecutions. The incentive which the prospect of treble damages provides for instituting private antitrust actions would be dampened by the threat of assessment of defendant's attorneys' fees and other costs as a penalty for failure.

This Court is unaware of any case in which a successful defendant has been awarded attorneys' fees in a private antitrust action. In the absence of any case authority or express statutory authorization, and in view of the strong policy considerations behind the private treble damage action, the Court is of the opinion that attorneys' fees should not be awarded to prevailing defendants.

▆ Moreover, there is no indication that the action was brought or prosecuted in bad faith. Extensive discovery was conducted by the plaintiffs in an attempt to ascertain the circumstances surrounding the antitrust conspiracy. The fact that this discovery uncovered little *direct* evidence of Aetna's alleged participation does not warrant the conclusion that the action was brought in bad faith. The Court reviewed the evidence at the close of plaintiffs' case in chief and was unable to say that the circumstantial evidence proffered by the plaintiffs was insufficient as a matter of law. For the foregoing reasons, Aetna's motion for the award of attorneys' fees must be DENIED.

## CONCLUSION

For the reasons set forth in this memorandum and order, it is,

ORDERED that the motions for judgment notwithstanding the verdict filed in behalf of Marshall-Michigan and the First Wisconsin defendants be and are hereby granted in part and denied in part;

ORDERED that the motions for a new trial filed in behalf of Marshall-Michigan and the First Wisconsin defendants be and are hereby GRANTED;

ORDERED that the motion for a new trial as to Aetna filed in behalf of the plaintiffs be and is hereby DENIED;

ORDERED that the motion for the award of attorneys' fees filed in behalf of Aetna be and is hereby DENIED;

ORDERED that the judgment entered in the above entitled action be and is hereby vacated;

FURTHER ORDERED that counsel for the remaining parties advise the Court within thirty days (30) as to their estima-

tions of the time it will take to retry the case on the single restraint of trade issue so that the matter may be placed on the trial calendar.