**LEE KLINGER VOLKSWAGEN, INC.,
Plaintiff-Appellant,**

v.

**CHRYSLER CORPORATION,** Chrysler Motors Corporation, Chrysler Credit Corporation, Chrysler Realty Corporation and Evanston Dodge, Inc., Defendants-Appellees.

No. 75–2166.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1976.

Decided July 20, 1978.

Certiorari Denied Dec. 4, 1978.
See 99 S.Ct. 616.

Francis J. McConnell, Chicago, Ill., for plaintiff-appellant.

Edward L. Foote, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, MARKEY, Chief Judge of the United States Court of Customs and Patent Appeals *, and GRANT, Senior District Judge.**

FAIRCHILD, Chief Judge.

On this appeal, the court is asked to consider the sufficiency of evidence of anti-competitive effect, in a specific instance, of Chrysler Motor Corporation's dual system of automobile distribution. Challenges to the system, brought under § 1 of the Sherman Act, have been dealt with in a number of cases,[1] and the background of the Chrysler dual system of distribution has been described in those opinions.

Plaintiff Lee Klinger Volkswagen, Inc. was formerly Lee Klinger Dodge, Inc., and was then an independent Dodge dealer. Klinger sued Chrysler Corporation, Chrysler Motor Corporation, Chrysler Credit Corporation, Chrysler Realty Corporation and Evanston Dodge, Inc. Evanston Dodge is a wholly-owned subsidiary of Chrysler, and formerly operated a company dealership. The complaint charged defendants with engaging in a combination and conspiracy unreasonably to restrain trade in the distribution of new Dodge cars.

At the close of plaintiff's case, the district court directed a verdict in favor of defendants. The court summarized plaintiff's position as "that the defendants collectively joined in concerted conduct in operating Evanston Dodge at a subsidized loss knowing that it would adversely affect Klinger," and such conduct violated § 1 of the Sherman Act. The court noted that plaintiff

---

* Chief Judge Howard T. Markey of the United States Court of Customs and Patent Appeals is sitting by designation.

** Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. *Mt. Lebanon Motors, Inc. v. Chrysler Corporation,* 283 F.Supp. 453 (W.D.Pa.1968); *Mt. Lebanon Motors, Inc. v. Chrysler Corporation,* 417 F.2d 622 (3rd Cir. 1969); *England v. Chrysler Corp.,* 493 F.2d 269 (9th Cir. 1974), *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107; *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3rd Cir. 1975); *Elfman Motors, Inc. v. Chrysler Corporation* (E.D.Pa.1977); *Glauser Dodge Co. v. Chrysler Corporation,* 570 F.2d 72 (3rd Cir. 1977). *Cf. Rea v. Ford Motor Co.,* 497 F.2d 577 (3rd Cir. 1974), *cert. denied* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106.

made no claim that defendant intended to injure plaintiff. The court concluded "that the evidence adduced does not and could not sustain a jury verdict in favor of the plaintiff on a section 1 theory."

We agree with the decision of the district court, and accordingly, AFFIRM.

I

Lee Klinger Dodge, Inc. formerly held a Dodge franchise and began operating in 1955 at 2525 West Touhy Avenue on Chicago's far north side. In 1966, at Chrysler's suggestion, Klinger moved several blocks southeast to 6600 North Western Avenue.

Evanston Dodge, Inc. was successor to Winfield Dodge, a dealer enterprise operation begun in 1962 in the northeastern Chicago suburb of Winnetka. In 1963, the dealership was moved to Evanston, another northeastern suburb, in which Chrysler was eager to have representation. George Moore, Chicago Metropolitan Branch Manager for the Marketing Investment Division of Chrysler Motors Corporation,[2] when questioned by plaintiff's counsel, explained that so eager was Chrysler to enter the Evanston market, that it moved into the first available facility, located at 1810 Ridge Avenue, though it was not really adequate. In 1963, Evanston Dodge at Ridge Avenue was approximately 3.5 miles from Klinger Dodge at Touhy Avenue. In 1967, Chrysler relocated Evanston Dodge from Ridge Avenue to 111 Chicago Avenue. This was in the automobile "dealer cluster" in Evanston[3] where Chrysler deemed it particularly important to have representation to compete adequately against Ford and General Motors. Evanston Dodge at Chicago Avenue was only a few hundred feet north of the Chicago boundary and thus, only 1.8 miles from Klinger Dodge at North Western Avenue.

In the nine years of its operation, Evanston Dodge had twelve different presidents. It is unclear how many were investor-dealers, but it is clear that none ran a profitable operation. Between 1963 and 1972, Evanston Dodge lost over $750,000. Continued operation was possible only because these losses were subsidized and underwritten by $790,000 in capital contributions and loans from Chrysler.

Golf-View Dodge, a dealer enterprise operation located in Morton Grove, another near-north suburb of Chicago, could also be considered in the same general marketing area as Klinger Dodge and Evanston Dodge. It sustained losses of over $300,000 in the four years, 1968 through 1971. Continued operation was possible only because these losses were subsidized by Chrysler.

Dealer enterprise stores in the Chicago metropolitan area,[4] in the aggregate, sustained losses of approximately $1,000,000 a year in 1970 and 1971. Chrysler subsidized these losses.

Mr. Klinger complained to Chrysler officials that the price cutting and subsidized operation of dealer enterprise establishments, particularly of Evanston Dodge, were adversely affecting his dealership, making it impossible for him to receive the return on investment he anticipated. At trial, plaintiff sought to highlight the adverse effect by pointing to differences in pricing and advertising between the two dealerships that gave Evanston Dodge an advantage it could not have enjoyed but for Chrysler's underwriting the resultant operational losses. On new automobiles, Evanston Dodge almost consistently underpriced Klinger Dodge: in 1965, by $78 per car; in 1966, by $63; in 1967, by $9; in 1968, by $56; in 1969, by $88; in 1970, by $51. Only in 1971 did Klinger offer new cars at prices lower than Evanston Dodge.[5] On used cars,

2. The Marketing Investment Division of Chrysler Motors conducts the Corporation's dealer enterprise program.

3. Ten automobile dealerships are located on Chicago Avenue in Evanston.

4. Chrysler considers the Chicago metropolitan area to include Lake County, Indiana and Cook, Lake and DuPage Counties, Illinois as well as a portion of Kane County, Illinois.

5. 1971 was the last year of operation for Klinger Dodge and plaintiff, therefore, claims that it cut its prices to get rid of its inventory. In 1971, Klinger underpriced Evanston Dodge by $71 per car.

however, Klinger almost always under-priced Evanston Dodge: in 1967, by $5 per car; in 1968, by $6; in 1970, by $9; in 1971, by $40. Only in 1969 did Evanston under-price Klinger, and then by $33 per car. With respect to advertising, Evanston re-peatedly outspent Klinger, on occasion budgeting twice as much as Klinger for this purpose.

Though Mr. Klinger complains that he was driven out of business by Chrysler's loss-subsidized operation of Evanston Dodge and other competing dealer enter-prises, Klinger personally drew a salary and his wholly-owned corporation did not lose money as a Dodge dealer.

In the years from 1963 through 1970, his salary ranged from $15,692 to $36,083, net profit from $1,881 to $18,731, and the total of the two from $23,692 to $54,814. .For the first half of 1971, just before termination, and for various reasons not a truly repre-sentative period, Klinger's salary was $12,-916, net profit $44,526, and the total $57,-442.

By 1970, Mr. Klinger had begun to ex-plore the possibility of abandoning the Dodge line and of becoming a Volkswagen dealer. In 1971 he and the Corporation resigned the Dodge dealership and he in-vested $275,000 in a Volkswagen franchise. In negotiations Volkswagen had projected first year earnings at $140,000. The parties did not anticipate, however, the tariff of $200–$300 per item soon placed on imports. This and other problems attendant on open-ing a new dealership produced a first year loss of $130,000.

The former Klinger Dodge location was taken over by Chrysler and converted to a dealer enterprise operation under the name Colonial Dodge. Evanston Dodge was closed in 1972. In that year Colonial Dodge showed a profit of approximately $100,000 and the same profit was recorded for 1973. On November 8, 1973, the successful inves-tor-dealer of Colonial Dodge bought out Chrysler's interest in the enterprise and es-tablished an independent franchise.

Plaintiff showed the proximity of the Klinger and Evanston Dodge locations, and that many customers of both came from the same neighboring area. It argues that these facts are sufficient to show damage to competition as a result of the departure of plaintiff. Concededly it did not offer proof to identify the market affected by Chrysler's challenged continued subsidy of losses, nor the percentage of the relevant market affected thereby.

The record does show, however, that there were some 25 to 30 independent Dodge dealerships in the Chicago metropoli-tan area at the time of trial, and that seven had been developed from dealer enterprise operations. By the time of trial, moreover, both Golf-View Dodge and Colonial Dodge were operating as privately-owned franchis-es, Chrysler's interest having been pur-chased by the investor-dealer.

## II

Plaintiff bases its claim exclusively on § 1 of the Sherman Act. Originally, it had complained of a § 2 violation, but this claim was abandoned. At no time did plaintiff allege a violation of the Robinson-Patman Act or the Automobile Dealers' Day in Court Act.

Plaintiff concedes that the continued op-eration of a distributor-subsidiary at a loss, made possible by a manufacturer-parent's grant of subsidy, is not a *per se* combination in restraint of trade. The gist of its claim is that the continued operation of Evanston Dodge at a loss, condoned and subsidized by Chrysler, has sufficiently been shown to have forced a competitor to cease competi-tion so that it could be found by the jury to be a combination or conspiracy in unreason-able restraint of trade.

Plaintiff concedes that the defendants had no intent to injure plaintiff. Thus, we are not concerned with predatory price-cut-ting for the purpose of eliminating competi-tion.

Plaintiff relies on language in the deci-sions dealing with intrabrand competition

indicating that pricing by distributors controlled by the manufacturer, if low enough to be reckless of profitable operation, may constitute unreasonable restraint of trade if competitors are thereby forced out of the field. In *England, supra,* note 1, at page 273, the Ninth Circuit *assumed* that a manufacturer's "predominant emphasis on market penetration, which results in the deliberately reckless operation of a subsidized retailer and which has the inevitable effect of forcing competing and non-subsidized dealers to function at an unprofitable level, could, if proved, constitute an unreasonable restraint of trade." Plaintiff here, however, was always able to make a profit.

In *Coleman, supra,* note 1, at page 1345, the Third Circuit said "although the evidence is weak, the jury could have found further that Chrysler's actions were unfairly competitive and that their effect was to force plaintiff out of business." In a footnote the Court commented "We are here concerned with effect not intent. . . ." The Court made plain, in showing that plaintiff had been forced out of business, that plaintiff suffered several years of losses· before its demise. Again, plaintiff Klinger was always able to make a profit.

In *Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72 (3rd Cir. 1977) the Third Circuit commented upon and explained *Coleman,* summing up, "The rejection in *Coleman* of Chrysler's contention that it was entitled to a judgment *n. o. v.* rather than a new trial is no more than a holding that on the record in that case a jury could have found a purpose or operative effect of forward vertical integration by the elimination of independent dealers in the geographic and product market there considered." 570 F.2d at 84. In *Glauser,* the Court held that on the record before it, judgment *n. o. v.* should have been granted and reversed a judgment for the plaintiff. "The fact that the source of the subsidy is the manufacturer itself, we conclude, does not under a rule of reason analysis of the facts bring this case within the reach of § 1 of the Sherman Act . . . Absent forward vertical integra-

tion whose purpose or actual operation is to concentrate Dodge sales in the hands of the Chrysler-owned dealers, the subsidies have a pro-competitive effect, at both the intrabrand and the interbrand levels." 570 F.2d at 86.

Plaintiff Klinger would argue that even absent a purpose to injure plaintiff, the evidence in the case before us would support jury findings that (1) defendant's conduct caused plaintiff, though a reasonably efficient operator, to cease business as a Dodge dealer, and (2) plaintiff's surrender significantly reduced competition for sales of Dodge automobiles.

Sufficiency of the evidence to support finding (1), causation of plaintiff's withdrawal, presents a close question. Defendants argue that the anticipation of very high profits in a new endeavor was the real cause. Klinger had undoubtedly made less money as a Dodge dealer than he would have liked, but plaintiff never had a loss year, and there was no evidence tending to show objectively that Klinger's personal salary plus corporate profits was unreasonably low compensation for his efforts plus return on his investment.

We conclude in any event that in order to reach finding (2) there must be proof identifying the relevant market and showing the effect thereon of the surrender of Klinger. We observe that this type of inquiry was pursued in both *Coleman* (albeit a monopolization claim was present) and in *Glauser.* In *Glauser,* moreover, the Court referred specifically to identification of relevant product and geographic markets as a necessary element of proof in this type of § 1 case. 570 F.2d at 81.

Presumably just after Klinger's withdrawal there was one fewer independent Dodge dealers than just before, but we think that in looking for and evaluating anti-competitive effects in order to determine whether there was an unreasonable restraint of trade, changes in the situation evolving over a reasonable interval must also be considered.[6] Although plaintiff did

---

6. As already noted, plaintiff concedes that the challenged conduct is not a *per se* violation of

§ 1. Accordingly, the "rule of reason" applies. There must be evidence sufficient to show that

not attempt to pursue the relevant market inquiry, the record does show that by the time of trial in October, 1975, Evanston Dodge had been terminated and the Chrysler-controlled dealer which replaced plaintiff had become independent, as had one other Chrysler-controlled dealer in the general area.

We think that a jury verdict, that the low-priced sales by Evanston Dodge, agreed to and made possible by Chrysler, had such a destructive effect on competition in the relevant Dodge market that it was an unreasonable restraint of trade, could not stand.

Accordingly, the judgment appealed from is AFFIRMED.

"the effect upon competition in the marketplace is substantially adverse." *U. S. v. Arnold Schwinn & Co.*, 388 U.S. 365, 374, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).