**JUNEAU SQUARE CORP. et al.,**
**Plaintiffs-Appellants,**

v.

**FIRST WISCONSIN NATIONAL BANK**
**OF MILWAUKEE et al.,**
**Defendants-Appellees.**

No. 79–2037.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1980.

Decided July 3, 1980.

---

George P. Kersten and E. Campion Kersten, Milwaukee, Wis., for plaintiffs-appellants.

W. Donald McSweeney, Chicago, Ill., James A. Urdan, Quarles & Brady, Milwaukee, Wis., for defendants-appellees.

Before SPRECHER and WOOD, Circuit Judges, and BUA, District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

The civil antitrust action before us has its origins in the development, or more aptly, nondevelopment of a portion of the City of Milwaukee's beautiful lakeshore skyline. Plaintiffs were developers of a major office building complex, known as Juneau Square, located on prime lakefront property in that city's central business district (CBD). Defendant First Wisconsin Corporation (First Wisconsin), a national bank holding company, is the parent of defendants First Wisconsin National Bank of Milwaukee (First Wisconsin National Bank), First Wisconsin Development Corporation (a corporation formed to develop First Wisconsin Center, the CBD's largest office building), and Marshall-Wisconsin Company (Marshall-Wisconsin) (a corporation formed to acquire and operate Juneau Square). Defendant Marshall-Michigan Company (Marshall-Michigan) is a Netherlands Antilles corporation formed as a vehicle for foreign national investment in Juneau Square. Defendant Aetna Life Insurance Company (Aetna) was a long-term mortgage lender for a part of the Juneau Square project.

## I.

The factual background of this case is set forth in extensive detail at 435 F.Supp. 1307 (E.D.Wis.1977). We adopt that statement of facts to the extent consistent with this opinion and summarize below only those facts necessary for disposition of this appeal.

In the early 1960's Wil-Ten Company (Wil-Ten) purchased property along the Lake Michigan shore in downtown Milwaukee. In 1962 Wil-Ten conveyed that property to plaintiff Juneau Square Corporation (the Corporation), its wholly-owned subsidiary. The Corporation then constructed a three-story office building, Juneau Square

South (South), on the property with construction financing providing by First Wisconsin National Bank. Aetna, the building's major tenant, provided permanent financing secured by a first mortgage.

In 1964 the Corporation commenced construction of a nine-story office building, Juneau Square North (North), on the same property immediately adjacent to South. Another bank, not a party to this suit, provided construction financing, and Aetna increased its loan to the Corporation to provide permanent financing. Shortly thereafter, the Corporation encountered financial difficulties, which culminated in 1966 with the sale of part of its interest in the project. Marshall-Michigan purchased an undivided one-half interest, and a number of individual investors purchased undivided interests totaling twenty-five percent. Marshall-Michigan and the individuals immediately leased-back their interests to the Corporation, which allowed the Corporation to retain operational control of the project. As security for the obligation to pay the rent stipulated in the lease-back agreement, Marshall-Michigan received a second mortgage, subordinate to Aetna's first mortgage, on the entire project. Unfortunately, the Corporation's financial difficulties continued despite these measures.

As North and South neared completion in 1967, the Corporation began preparing for construction of the final and most ambitious phase of the project, Juneau Square East (East), a high-rise office tower. The Corporation's assets and cash flow, however, were insufficient to complete improvements on North and South that had been promised to tenants and to begin construction of East. Aetna provided some help by agreeing to a moratorium on principal payments under its mortgage loan on North and South. Planning of East then proceeded, but by early 1969 the Corporation fell into default under the Aetna and Marshall-Michigan mortgages because of its failure to pay $245,000 in real estate taxes. At this

---

* The Honorable Nicholas J. Bua, United States District Judge for the Northern District of Illinois, is sitting by designation.

point, the Corporation began its search for additional financing.

While the Corporation encountered these financial difficulties, First Wisconsin formulated plans to construct a new corporate headquarters (First Wisconsin Center) adjacent to the Juneau Square site. The First Wisconsin project contemplated placing approximately one million square feet of prime new office space on the CBD market. East was scheduled for completion one year earlier than First Wisconsin Center and would have added 300,000 square feet of new office space in the CBD. Market studies indicated that the CBD could absorb only 200,000 square feet of new office space annually. This obvious competitive pressure is the setting for plaintiffs' antitrust claims.

In late 1968 Richard Holscher, the officer responsible for developing First Wisconsin Center, began securing land upon which to build the office tower. Holscher negotiated an agreement with Northwestern Mutual Life Insurance Company (NML) to transfer a parcel of land to First Wisconsin and to act as First Wisconsin's agent in the acquisition of additional land for possible later expansion. NML apparently had been planning to build a 100,000 square foot office building in the CBD to open about the same time as First Wisconsin Center but, as part of the agreement, shelved those plans for five years. This allowed First Wisconsin to lease its Center without competition from NML.[1]

A few months later, Holscher met with one of First Wisconsin's attorneys, David Shute of the Milwaukee law firm of Foley & Lardner. At that meeting, Holscher and Shute apparently discussed plans for the acquisition by First Wisconsin of the Juneau Square project. Afterwards, Shute sent a handwritten memorandum to Chicago attorney Harold Shapiro, which contained confidential information gleaned from First Wisconsin's credit files, instructing Shapiro to explore with Aetna its interest in selling its mortgage on North and South.[2] Shute also instructed Shapiro not to disclose to Aetna that First Wisconsin was his principal. Shapiro, acting for his blind principal, met with Aetna representatives on March 18, 1969, but failed to evoke any interest for the proposition. Almost simultaneously, the Corporation sought to persuade Aetna to finance East, but on March 11, 1969, one week before the Shapiro visit, Aetna informed the Corporation that it would not provide that financing.

Having lost Aetna, the Corporation found it necessary to seek financing elsewhere.

---

1. The agreement with NML notwithstanding, First Wisconsin Center faced significant potential competition from East, which offered earlier occupancy and a more desirable location enhanced by an unobstructed view of Lake Michigan. In addition, the East site was attractive as an additional parcel, adjacent to the NML parcel, for possible later expansion of First Wisconsin Center. Incident to his investigation of possible expansion sites, Holscher reviewed the credit files maintained at First Wisconsin National Bank on the Corporation and Wil-Ten, both of whom were customers. Plaintiffs urged that Holscher's interest stemmed from a desire to eliminate the potential competition that development of East likely would bring. Plaintiffs further urged that Holscher's peek into the confidential credit files was one of many unfair methods of competition that comprised the unlawful conspiracy.

2. The Shute-Shapiro memorandum reads in pertinent part:
 5. We have reason to believe Aetna might like out of the situation—
 a. low rate

b. shaky financial history project & its developers
We understand developers have been trying to raise funds for new project from various sources, and they are apparently down to Aetna & will be filing application next week for loan for "East" project . . .
 * * * * * *
6. Our strategy:
a. As representatives of interested undisclosed prin., contact Aetna for prelim. discussions. We believe best contact wd. be . .. Swinehart, who once held title of V.P. in charge of Mgages. Might start with him, see where he leads you.
 * * * * * *
b. Our client's int. is to purchase entire block for cash. Our knowledge of details of deal, as disclosed to Aetna, shd. be limited to what we might have been able to find out w/o "insider" info (will leave to your good judgment). We would pay fair *cash* price equal to market value.

In the summer of 1969 the Corporation entered negotiations with Metropolitan Life Insurance Company of New York (Metropolitan). The negotiations, however, became snagged when Aetna refused to release from its mortgage some land essential to the construction of East. The parties reached an accommodation, however, when Aetna agreed to provide necessary and appropriate air rights and easements. By the beginning of November 1969 workups and investigations incident to the Metropolitan financing package were substantially complete, and Metropolitan requested that representatives of the Corporation travel to New York on November 5, 1969 to complete the financing package subject to Aetna's conveyance of the air rights and easements. Immediately before that meeting, in a sudden about-face, Metropolitan informed its Milwaukee representative, Warren Stringer, that the deal was dead. Stringer relayed that information to a representative of the Corporation who called Metropolitan for an explanation. Metropolitan remained silent until a week later when it sent a letter to the Corporation listing its reasons for canceling the deal. In that letter, Metropolitan informed the Corporation that a generally unfavorable market and the availability of more attractive investment opportunities were behind its declination.

During the negotiations that culminated in its decision not to finance East, Metropolitan contacted James Liek, a First Wisconsin National Bank employee, seeking his opinion of the financial stability of the Juneau Square project and its developers. Liek testified he told Metropolitan that the Juneau Square property was prime quality but that the Corporation had encountered problems developing North and South and had an overdue loan outstanding at First Wisconsin National Bank. Further, Liek indicated he was unaware of any interest First Wisconsin might have had in acquiring the project at that time.[3]

On November 13, 1969, one week after Metropolitan bowed out, Aetna began a foreclosure action against the Corporation based on its failure to pay real estate taxes. When Marshall-Michigan learned of the foreclosure, its New York-based representative, John Sann, traveled to Milwaukee with a $245,000 check payable to Aetna to cure the default and reinstate the mortgage. Upon arrival in Milwaukee, Sann met with Marshall-Michigan's local counsel, Robert Bradley of Foley & Lardner, and Richard Holscher of First Wisconsin. As noted, Foley & Lardner also served as counsel to First Wisconsin. Consequently, Bradley was aware that First Wisconsin was interested in acquiring Juneau Square and so advised Sann. Sann then inquired of Holscher whether First Wisconsin would be interested in acquiring Marshall-Michigan's interest in the project, which at that time was subject to Aetna's foreclosure action. Holscher declined assertedly because First Wisconsin was not interested in buying a lawsuit. Holscher, however, indicated First Wisconsin might be interested in acquiring the project upon satisfactory resolution of the foreclosure action.

Amid growing concern about the Corporation's possible diversion of funds from North and South revenues for development of East, Marshall-Michigan sent letters to each North and South tenant directing that rental payments be deposited in a special escrow account.[4] At about the same time, Sann also persuaded Aetna to delay its foreclosure action for a time sufficient to permit Marshall-Michigan to gain control of the project. Marshall-Michigan then commenced a foreclosure action on its second mortgage, but the Circuit Court of Milwau-

---

**3.** Although Liek claimed he first became aware of First Wisconsin's desire to acquire Juneau Square in May 1971, the formal minutes of a meeting of the First Wisconsin executive committee record Liek as present when the body granted authority to acquire Juneau Square. Liek appeared at that meeting to report on matters unrelated to Juneau Square. Appar-
ently, it was not unusual at such meetings for nonmembers reporting on specific matters to leave the meeting room at the conclusion of the report.

**4.** Since Marshall-Michigan held interests in North and South only, diversion of revenues to East was at its expense.

kee County refused to appoint a receiver. Aetna then declared void its promise to delay foreclosure and proceeded.[5]

Upon the collapse of the Aetna/Marshall-Michigan agreement, the Corporation began negotiations in both foreclosure actions, which culminated in Aetna's and Marshall-Michigan's stipulations that they would grant air rights and easements necessary for construction of East and reinstate Aetna's mortgage on North and South provided the Corporation secured financing by September 30, 1970. In exchange, the Corporation waived its foreclosure defenses and right of redemption and agreed that Aetna and Marshall-Michigan could enter judgment against the Corporation if the deadline passed without the acquisition of financing. When the Corporation failed to meet the deadline, Aetna sought entry of judgment pursuant to the stipulation. However, when Aetna met resistance from the presiding county judge, Aetna and the Corporation entered into a second stipulation, which set December 31, 1971 as the new deadline for securing financing.

The next avenue of exploration for the Corporation in its quest for financing was the New York Life Insurance Company (New York Life). In due course, New York Life's Chicago office forwarded the Corporation's application for financing with a favorable recommendation to its New York headquarters. On May 5, 1971, New York Life's Real Estate and Mortgage Loan Committee considered whether to grant initial approval for the loan. Some question arose at the meeting regarding one of the banks involved in the financing, Midland National Bank (Midland). The committee, therefore, took no action, instead directing Frederick Duncan, New York Life's treasurer, to investigate Midland's financial strength. Duncan contacted Albert Little of First Wisconsin National Bank and requested that he do a credit check on Midland. Little examined First Wisconsin National Bank's credit files on Midland and informed Duncan's office of his findings a few days later. The New York Life employee who spoke with Little memorialized the substance of that conversation in a contemporaneous memorandum that indicated Little had told him that Juneau Square was underfinanced and that Midland was a reasonably stable but small bank that might be biting off more than it could chew.[6] On

---

5. Plaintiffs argue that the foregoing supports the inference that Marshall-Michigan joined the conspiracy at this point. The district court explains:

This inference was based on the following circumstances. Prior to the commencement of the Aetna foreclosure action, Marshall-Michigan had cooperated with the plaintiffs in the development of the project. When Sann and Clark came to Milwaukee their intention was to cure the tax default and reinstate the mortgage. After conferring with local counsel, a meeting was arranged with the First Wisconsin defendants. As a result of this meeting and the subsequent attempts of Marshall-Michigan to acquire control of the project set forth above, the jury was asked to infer that Marshall-Michigan joined the conspiracy in order to salvage its investment interest in the project. Knowledge of the conspiracy in restraint of trade is imputed to Marshall-Michigan because of the fact that both Marshall-Michigan and the First Wisconsin defendants were represented by the same law firm; they presumably were both fully advised of the situation before reaching agreement and Marshall-Michigan was in any event presumably

aware of the competitive position of the plaintiffs and the First Wisconsin defendants. 435 F.Supp. at 1314.

6. The memorandum reads in pertinent part:

We were told that the property has been developed in instalments and was "bootstrapped all the way." They have a high debt. It was believed that the mortgage held by . . . Aetna was in trouble and the lender has agreed to defer foreclosure. Our source bank had a part in the construction lending and found proceeds were not being used as indicated. There appeared to be several recent judgments and liens against the property.

It was our source's opinion that the entire project was not adequately financed. Recent high interest rates gave them real problems.

The Midland National Bank was described as a retail oriented institution that has made reasonable progress. They took over a bank a short while ago and this accounts for a jump in deposits from $60 million to $100 million. The bank's President, Mr. Kelly, was described as a very aggressive banker who was not well liked in the local financial community. He had been with the Marine

May 19, 1971, the committee once again considered and, on a vote of five to one, rejected the application.[7]

At this point, the Corporation sought financing from a new source, the Baird & Warner Real Estate Investment Trust (Baird & Warner). By mid-December 1971 Baird & Warner tentatively agreed to make an equity investment in the project. On December 20, less than two weeks before the stipulated deadline, representatives of Aetna, Baird & Warner, and the Corporation met to discuss the new financing arrangement. Aetna apparently expressed a willingness to accommodate the arrangement by withholding entry of the foreclosure judgment provided Marshall-Michigan also did so. Marshall-Michigan initially agreed but then reneged and entered judgment on January 3, 1972. Aetna followed suit on January 4. The entry of those judgments marked the extinguishment of any hope the Corporation had that Baird & Warner would finance East.

Marshall-Michigan, on February 28, 1972, purchased the project for a nominal amount, subject to Aetna's mortgage, at a sheriff's sale. Shortly thereafter, Marshall-Michigan sold its interest to Marshall-Wisconsin, a First Wisconsin subsidiary. Marshall-Wisconsin then reached agreement with Aetna, establishing a new mortgagor-mortgagee relationship and leaving First Wisconsin in control of Juneau Square. Later that year, plaintiffs filed a civil antitrust action seeking treble damages under section four of the Clayton Act, 15 U.S.C. § 15, on their claims that defendants violated sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, and section seven of the Clayton Act, 15 U.S.C. § 18.[8] Trial began on May 3, 1976 before Judge Warren, who has presided over this case throughout its long life. At the close of plaintiffs' case, the court, on motion of defendants, entered a directed verdict against plaintiffs on their claims under section two of the Sherman Act. On October 1, 1976, the jury returned a verdict on the remaining claims, finding that all defendants except Aetna had conspired to restrain trade unreasonably in the leasing, development, construction, and financing of rental office space in the Milwaukee CBD in violation of section one of the Sherman Act, and awarding damages of $6 million. After trebling and set-off, the court entered judgment in the amount of $16.5 million. Defendants, except Aetna, then moved for judgment notwithstanding the verdict or, alternatively, a new trial on all claims. By Memorandum and Order dated July 29, 1977, the court granted judgment notwithstanding the verdict on the interstate financing portion of plaintiffs' Sherman Act claims, 435 F.Supp. at 1321, and ordered a new trial on the other claims against each defendant, *id.* at 1321–26, except Aetna.[9] The court refused plaintiffs' request for certification of an interlocutory appeal of the new trial order pursuant to 28 U.S.C. § 1292(b). This court by unpublished order dated February 17, 1978 then dismissed for lack of jurisdiction plaintiffs' appeal of the new trial order.

Late in 1977, before the second trial, First Wisconsin and Marshall-Michigan filed a motion for summary judgment and a renewed motion for judgment notwithstanding the verdict based upon the then-recent decisions of the United States Supreme Court in *Illinois Brick Co. v. Illinois,*

Bank where he led a proxy fight to get control of the corporation that was largely owned by interests close to the bank for which he was working.

7. The minutes of the meeting indicate that the reason for the rejection was the concern that Midland was unqualified to coordinate such a large, complex financial transaction. There was some evidence, namely a subsequent New York Life memorandum, that the integrity of the Corporation was a factor. That memorandum reads in pertinent part:

Mr. Lutz [chairman of the loan committee] indicated:
1. Sponsors had mis-handled funds and were being foreclosed.
2. Bank was not sufficiently capitalized to handle gap funds.

8. Plaintiffs did not appeal the pretrial dismissal of their § 7 claim.

9. The court denied plaintiffs' motion for a new trial on its claims against Aetna. 435 F.Supp. at 1326–27.

431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). A part of this motion contained a challenge to the standing of certain plaintiffs to sue under section four of the Clayton Act. The court denied the principal portions of the motions but dismissed a subsidiary of the Corporation and a number of its principal officials.[10] The court, however, stayed the motion to dismiss Wil-Ten pending plaintiffs' presentation of their damage theories at the second trial. After that presentation, the court dismissed Wil-Ten for lack of standing.

The second trial concluded on June 19, 1978 with a jury verdict for defendants on all issues. Shortly thereafter, plaintiffs moved for a new trial, which the district court denied. This appeal followed.

## II.

▮ An order granting a new trial is not a final order within the meaning of 28 U.S.C. § 1291 and is therefore generally not appealable. *Eady v. Foerder,* 381 F.2d 980 (7th Cir. 1967). Nevertheless, after a new trial and entry of final judgment an appellate court entertaining an appeal from the final judgment may review the new trial order and, where appropriate, reinstate the original verdict. *See Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.,* 569 F.2d 181 (2d Cir. 1977); *Dassinger v.*

South Central Bell Telephone Co., 537 F.2d 1345 (5th Cir. 1976); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2818 (1973 & Supp.1979). Appellate review of a new trial order, however, is exceedingly limited because of the broad discretion that trial judges possess in this area. *Durant v. Surety Homes Corp.,* 582 F.2d 1081, 1088 (7th Cir. 1978). Only upon a clear showing that a trial judge abused this broad discretion may an appellate court overturn a new trial order. *Hahn v. Becker,* 588 F.2d 768, 771 (7th Cir. 1979); *Stinebower v. Scala,* 331 F.2d 366, 367 (7th Cir. 1964). In reviewing the new trial order entered by Judge Warren we do not seek to substitute our judgment for his judgment that a new trial was appropriate. We seek only to determine whether he abused his discretion.

The court granted a new trial on the basis of four principal factors: (1) prejudicial effect of admission of certain hearsay testimony and evidence, (2) the weight of the evidence did not establish the conspiracy requisite under the Sherman Act, (3) an unfair imbalance between the time allotted to plaintiffs and defendants for presentation of their respective cases, (4) jury confusion over the nature of the antitrust claims and the appropriate damages. In sum, the court concluded, these factors resulted in a "miscarriage of justice." 435 F.Supp. at 1326.[11]

---

**10.** The court dismissed plaintiffs Juneau Square Services, Inc., Harold C. Smith, III, Jack D. Moertl, and John F. Spoden because any injury they may have suffered was derivative. Plaintiffs conceded Moertl and Spoden lacked standing. However, their dismissal and the dismissal of Juneau Square Services, Inc., and Smith is one of the items set forth in plaintiffs' notice of appeal. Nevertheless, since plaintiffs did not pursue the matter in their briefs or at oral argument, we shall not address it.

**11.** Plaintiffs' threshold claim is that the court's grant of a new trial "in the interest of justice," a ground not specifically asserted in defendants' motion, was effectively a sua sponte grant of a new trial. They argue that under Fed.R. Civ.P. 59(d), the court acted without jurisdiction since the order was entered more than ten days after entry of judgment. Rule 59(d) provides:

> *On Initiative of Court.* Not later than 10 days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party. After giving the parties notice and an opportunity to be heard on the matter, the court may grant a motion for a new trial, timely served, for a reason not stated in the motion. In either case, the court shall specify in the order the grounds therefor.

In so arguing, plaintiffs misread the relevant portion of the court's order. The court did not grant a new trial for reasons not stated in defendants' motion. The court's statement to the effect that a new trial is in the interest of justice merely represents its conclusion drawn from consideration of the reasons asserted in defendants' motion. As Professor Wright notes, "Rule 59 gives the trial judge ample power to prevent what he considers to be a

Plaintiffs separately attack the propriety of Judge Warren's consideration of each of the foregoing factors. In so doing, they rely upon Fed.R.Civ.P. 61, which provides in pertinent part that harmless trial errors, that is those that "do[ ] not affect the substantial rights of the parties," are not proper grounds upon which to grant a new trial. That is an accurate statement of black letter law, and one with which Judge Warren is undoubtedly well aware. His conclusion that the trial resulted in a miscarriage of justice indicates he did not believe the errors, in light of the trial setting, the character of the evidence, and the complexity of the legal issues, were harmless. We shall consider his findings on that basis only to the extent necessary to determine whether that conclusion was an abuse of discretion.

Critical to plaintiffs' antitrust claims is the establishment of a nexus between First Wisconsin and the sources of financing that the Corporation pursued. Plaintiffs sought to establish that nexus by showing that First Wisconsin deliberately interfered with plaintiffs' attempts to secure financing from Metropolitan and New York Life.[12] The core of that interference was, assertedly, the credit report that Albert Little of First Wisconsin National Bank orally gave to New York Life upon the latter's request at the time the East financing proposal was before the loan committee. Plaintiffs asked the jury to infer that similar interference blocked their efforts to secure Metropolitan as a source of financing. At trial, Jack Moertl, one of the individual plaintiffs and an officer of the Corporation, testified about a conversation that occurred between him and a Baird & Warner employee, Jack Cisco, on the day the New York Life financing plan collapsed. Moertl testified that Cisco told him that the financing package fell through because of a credit report from First Wisconsin National Bank that painted a very unfavorable picture of the integrity of the Corporation's principals.[13] The court admitted the testimony on the ground that it was not offered for the truth of the matters asserted therein and therefore was not hearsay. Nevertheless, plaintiffs' counsel in cross-examining Little and Holscher and during closing arguments repeatedly characterized this testimony as being indicative of the contents of the credit report.[14] The jury was thus left with the clear, but highly prejudicial, impression that Cisco was reporting on behalf of New York Life the reasons for declining to provide financing.

Plaintiffs' assertion that Cisco was an agent of New York Life because his employer, Baird & Warner, was a New York

---

miscarriage of justice. It is his right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so." 11 C. Wright & A. Miller, Federal Practice and Procedure § 2803 (1973 & Supp.1979).

**12.** As the district court noted, 435 F.Supp. at 1321–22, "[w]ithout these overt acts, the conspiracy makes little sense in light of the fact that both Aetna and Marshall-Michigan granted two extensions to the plaintiffs in order to permit them to salvage the project."

**13.** Moertl testified that Cisco told him the following:

Your New York Life financing is dead. It has been shot down. . . . Someone has given a credit report to New York Life Insurance Company that typifies you as crooks. We are told that we could have just as well sent Al Capone for a loan to New York Life. * * * [Y]ou and Mr. Spoden have been painted as crooks and . . . the financing is dead.

As to the source of this information, Moertl further testified Cisco told him in that same conversation:

You should know full well where it came from. It came from the outfit that is building a building next door to you, the First Wisconsin Bank of Milwaukee.

**14.** For example, plaintiffs' counsel tendered the following questions to Holscher:

Q. That's a sophisticated way of a sophisticated banker telling a lender off in New York these people are crooks, isn't it?
 * * * * * *
Q. Isn't it a fact, Mr. Holscher, that it takes quite a bit of thought to draft a report that can kill a project by killing the developers in the eyes of the lender and still hope to avoid libels and slanders . . . ?

Plaintiffs' counsel also questioned Little in an argumentative manner, which added to the prejudicial impact of Moertl's testimony:

Q. That is a very sophisticated way of killing a loan, isn't it, Mr. Little, isn't it?

Life correspondent,[15] has no support in the record. Baird & Warner was acting on behalf of plaintiffs in these negotiations. In any event, even if Baird & Warner was acting as New York Life's agent, Moertl's testimony should have been excluded because there is no suggestion of the source of Cisco's statements or whether he was acting within the scope of his agency. For that reason, plaintiffs' reliance on *Lawlor v. Lowe*, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341 (1915), is misplaced. In a cryptic sentence in that antitrust case, Justice Holmes wrote that "[t]he reason[s] given by customers [to plaintiffs' salesmen] for ceasing to deal with sellers . . . were admissible." *Id.* at 536, 35 S.Ct. at 173. Concededly, the customers in *Lawlor* had first-hand knowledge of their reasons for refusing to deal. There is no suggestion that Cisco had any such knowledge. *Lawlor* does not support the proposition that a witness may testify to what a nonwitness said when there is no showing that the nonwitness' knowledge of the facts is direct or stems from a reliable source.

■ We cannot say that the trial court abused its discretion when it concluded that admission of this testimony at the first trial was not harmless error. All witnesses connected with New York Life testified that doubts about Midland National Bank's capabilities caused the rejection. Nevertheless, Moertl's testimony attributed the rejection to the Little credit report and described the contents of that report in the most inflammatory of terms.

Plaintiffs also introduced a memorandum drafted by William Lutz, chairman of the New York Life loan committee. In that memorandum Lutz wrote that Joe Wilford, a New York Life midwest regional officer, told him that a source at Baird & Warner informed him that First Wisconsin had contacted Baird & Warner to inquire whether the Corporation had any "clout" with New York Life. The memorandum continued:

[First Wisconsin] apparently made it clear to Baird & Warner that they didn't want this building built—apparently because it would interfere with the timing of the leasing in their proposed building. Our correspondent [Baird & Warner] conveyed to Joe Wilford the feeling that there were veiled intimidations [sic] along the lines that First Wisconsin would use their best efforts to delay or interfere with the construction of this building.

After drafting the foregoing memorandum, Lutz concluded that because of the nature of the statements attributed to First Wisconsin, he should investigate further. In a subsequent memorandum, he reported that the source at Baird & Warner "said there was a misunderstanding—that the two officers of First Wisconsin Bank were simply interested in knowing whether the applicants were actually seeking a loan . . . ." Furthermore, Lutz concluded after speaking with the source's former employer, the source "is considered capable of doing anything to make a deal."

The court admitted the first Lutz memorandum under the umbrella of the business records exception to the hearsay rule. Fed. R.Evid. 803(6). Rule 803(6) contains the proviso that business records are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." One of the factors the trial court considered in granting a new trial was the apparent unreliability of the initial Lutz memorandum. The statements in that memorandum crossed at least three levels of hearsay. Furthermore, when questioned directly, the Baird & Warner "source" testified he had received only general inquiries from First Wisconsin. These considerations coupled with Lutz' subsequent disavowment after his personal investigation of the information contained in the initial memorandum show just how unreliable that memorandum was in fact. The prejudicial nature of the initial memorandum is apparent on its face. Lutz im-

---

15. An official of New York Life testified that its correspondents are under contract to bring investment opportunities to New York Life's attention and to service loans that they have instigated.

plicitly charged First Wisconsin with attempting to block any accord that plaintiffs and New York Life might have reached on a financing package. We find no fault and in fact are impressed with Judge Warren's candor in recognizing after the trial that the memorandum should not have been admitted.

Standing alone, the admission of the Moertl testimony and the Lutz memorandum hardly seems sufficient to warrant a new trial. However, as the trial progressed it became more and more apparent that the critical cog in plaintiffs' conspiracy theory was First Wisconsin's alleged interference with the Metropolitan and New York Life financing packages. Judge Warren examined the evidence regarding the First Wisconsin-Metropolitan contact and concluded, as was his prerogative, *Durant v. Surety Homes Corp.*, 582 F.2d at 1087, that Metropolitan had substantial business reasons for declining to provide financing. In addition, there was no evidence that anything Liek of First Wisconsin National Bank told Metropolitan was inaccurate. Plaintiffs' theory therefore reduced itself to reliance upon the alleged impropriety of the credit report that Albert Little conveyed to New York Life and New York Life's subsequent decision not to finance East. Plaintiffs asked the jury to infer that similar "interference" occurred at Metropolitan. The Moertl testimony and the Lutz memorandum were the only evidence of the causal relationship between the credit report and New York Life's declination of financing. Its admission therefore was most certainly not harmless.

The trial judge, sitting at a much better vantage than this court, relied on the foregoing and a number of other factors to conclude that the verdict in the first trial represented a miscarriage of justice. Some of the other factors he pointed to were a gross imbalance in the time allotted to the parties, jury confusion about the legal theories upon which plaintiffs offered certain items of evidence and about the nature of proof required to award damages, and confusing and erroneous instructions. We need not consider each factor separately to determine whether we would have granted, were we sitting as trial judges, a new trial on the basis of each. As we said before, our review is limited to the question whether the trial judge's conclusion that a miscarriage of justice occurred was an abuse of discretion. If a single ground supports the new trial order, it is not reversible. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Nuttall v. Reading Co.*, 235 F.2d 546, 548 (3d Cir. 1956). We are convinced that Judge Warren did not abuse his discretion in granting a new trial solely on the basis of the factors we have discussed. We have examined the remaining factors upon which Judge Warren relied and they indicate that he was remarkably thoughtful and candid in evaluating the prejudice that certain of his actions may have caused defendants.

### III.

Following entry of the order granting defendants' motion for a new trial, the parties participated in a second trial before the same court. This time the jury found for defendants. Asserting that numerous errors occurred at that trial, plaintiffs appeal to this court to order a third trial.

### A. Restraint of Trade

During the second trial, the court informed the parties of its intention to instruct the jury that "proof of specific public injury is not required." It is sufficient, the planned instruction read, for plaintiffs to show that the restraint "tends or is reasonably calculated to prejudice the public interest." On the morning of the final day of argument, the court informed the parties that it was taking under advisement one of defendants' proposed instructions that it had earlier rejected. That proposed instruction reads:

Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. In order to recover under Section 4 of the Clayton

Act the plaintiffs must demonstrate that there was injury to competition, not merely injury to a competitor, and that the injury resulted not simply from the violation alleged but reflects the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. I instruct you that the antitrust laws were enacted for the protection of competition, *not* competitors. Therefore, you must find in favor of the defendants unless plaintiffs have proven that defendants' acts injured not only Juneau Square Corp. and/or the other plaintiffs, but competition in the Milwaukee office rental real estate market as well.

■ As a threshold matter, plaintiffs assert that they did not have a reasonable opportunity to argue the inappropriateness of the proposed instruction or an opportunity to argue the evidence to the jury in terms of the revised instruction. The record indicates, however, that Judge Warren offered plaintiffs ample opportunity to object to any of the instructions. Plaintiffs took advantage of that opportunity to object to the substantive law stated in the instruction but did not object to the timing of the change. That latter failure precludes plaintiffs from objecting now to Judge Warren's timing. Plaintiffs, however, did interpose timely objection to the substantive accuracy of the proposed instruction; the question of the substantive accuracy of the instruction that was actually given is therefore properly before us.

■ There is some merit to plaintiffs' assertion that the proposed instruction is not an accurate statement of the law. Although it clearly states plaintiffs' burden of showing public injury, it does not mention that that burden may be met by evidence that defendants' conduct tended to or was reasonably calculated to prejudice the public interest. Were the proposed instruction actually given, we might be constrained to reverse. But contrary to plaintiffs' contention, the instruction given did not make the same omission. Apparently to avoid the precise problem plaintiffs find in the proposed instruction, the court trimmed its language and clarified the method by which plaintiffs could meet their burden. The court read the following instruction:

The term "restraint of trade," which must be the objective or effect of any contract, combination or conspiracy condemned by the anti-trust laws contemplates only an unreasonable restraint of trade. The law recognizes that it may be impossible to conduct a business without in some degree restraining trade. The antitrust laws were enacted for the protection of competition, not competitors. The plaintiffs must, therefore, establish that the defendants' acts injured not only the plaintiffs themselves, but competition in the leasing of office rental space in the central business district of the City of Milwaukee.

The plaintiff is not entitled to recover in this case by showing concerted activities of the defendants restrained interstate commerce to some degree, *they must show that there was an unreasonable restraint. A restraint is unreasonable if it tends or is reasonably calculated to prejudice the public interest* . . . . . [T]he plaintiff may not recover unless you find an unreasonable restraint by a preponderance of the evidence as defined in these instructions. (emphasis added)

The italicized portion of the instruction correctly states plaintiffs' burden of showing that defendants' actions tended or were reasonably calculated to prejudice the public interest, which, as the first subparagraph of the instruction correctly states, lies in free and open competition in the CBD office rental market.

■ In another instruction, the court, over defendants' objection, instructed the jury that the purpose of the Sherman Act is "to preserve and advance our system of free competitive enterprise and to encourage to the fullest extent practicable free and open competition in the marketplace." An adverse effect upon competition, however small, is the distinguishing characteristic of a restraint of trade in contrast to a business tort. We have little trouble imagining the

possible confusion of a juror struggling with the distinction between these two unlawful acts. Without the instruction given, the court's instruction on the purpose of the Sherman Act likely would have misled the jury into believing that it could find for plaintiffs upon a showing that nothing more than a business tort occurred. The Sherman Act requires more than mere injury to a competitor. Plaintiffs must show also that the "effect upon competition in the marketplace is substantially adverse." *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967); *see Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 F.2d 196, 204 (7th Cir.), *cert. denied*, 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979); *Lee Klinger Volkswagen, Inc. v. Chrysler Corp.*, 583 F.2d 910, 914–15 & n. 6 (7th Cir.), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 616, 58 L.Ed.2d 680 (1978). The instruction is thus a fair statement of the law phrased in language fair to both parties. Absent the instruction, the jury might have been led to believe by the other instruction that it could award damages for injuries arising from conduct that had no impact on the relevant market merely because plaintiffs and defendants were competitors in that market.

Plaintiffs' reliance on *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), and *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), for the proposition that it need not show actual injury to competition is misplaced. Those cases involved group boycotts, a per se antitrust violation. Unlike the present case, which was properly analyzed using the rule of reason, *see* pp. 812–813 *infra*, per se violations are by nature presumed to have a "pernicious effect on competition." *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Absent that pre-

sumption, the instruction given in this case properly apprised the jury of plaintiffs' burden.

### B. *Aetna*

■ Plaintiffs next challenge as error the court's instruction to the jury that "you may not find that Aetna Life Insurance Company was a member of the alleged conspiracy." At the core of plaintiffs' challenge is its assertion that when Judge Warren ordered a new trial, he should have included all parties. (The jury in the first trial found in favor of Aetna.) As we have noted elsewhere in this opinion, *see* p. 806 *supra*, appellate review of the grant of a new trial motion is exceedingly limited. That same standard—abuse of discretion—defines our review of the denial of a new trial motion. *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 759 (3d Cir. 1977).

■ The grant of a new trial to a party who has received an adverse verdict does not require the grant of a new trial to a party who has received a favorable verdict. *Somerville v. Capital Transit Co.*, 192 F.2d 413 (D.C. Cir. 1951), *cert. denied*, 342 U.S. 941, 72 S.Ct. 553, 96 L.Ed. 700 (1952). The factors that the trial court relied upon in granting a new trial to the other defendants were prejudicial to all defendants, including Aetna, and therefore tended to reinforce the verdict in favor of Aetna. Under these circumstances, plaintiffs are hard-pressed to contend that Judge Warren abused his discretion by not ordering Aetna to stand trial again. The instruction here challenged was therefore not in error. Were plaintiffs' theory to prevail in the kind of case presented here, Fed.R.Civ.P. 59(a), which specifies that a trial court may order a new trial as to "all or any of the parties and on all or part of the issues," would be emasculated.[16]

■ Plaintiffs further argue that even if the trial court did not err in precluding the jury from finding that Aetna was a

---

16. The question of the participation by any one party in an alleged conspiracy is a separable issue that is not intertwined with the question of participation by other parties in such a way

to require a new trial for all where a new trial is granted to some. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 247, 60 S.Ct. 811, 855, 84 L.Ed. 1129 (1940).

812

conspirator, it did err in forbidding plaintiffs from arguing or the jury from finding that Aetna was controlled and manipulated by the other defendants. Although plaintiffs had not previously relied upon this theory, they contend the trial judge should have read their third amended complaint with greater breadth. We have examined that complaint and find nothing there supportive of plaintiffs' argument. Their theory throughout the case was that Aetna was a conspirator not the unwilling dupe of other defendants. The trial judge correctly recognized that such an assertion would require further amendment of the complaint. We see no error in the decision to deny the motion for leave to amend after commencement of the second trial and five years since the filing of the original complaint. Plaintiffs' attempt to do so is little more than an attempt to undercut the verdict in favor of Aetna in the first trial. In any event, plaintiffs are unable to point to any prejudice they suffered as a result of the foreclosure of their "control and manipulate" argument. Plaintiffs remained free to, and in fact did, present evidence that First Wisconsin interfered with plaintiffs' attempt to secure financing from Aetna. Short of permitting relitigation of Aetna's complicity in the alleged conspiracy, the court allowed plaintiffs substantial room both in argument and in the introduction of evidence.

■ Plaintiffs contend also that the court erred in instructing the jury that insufficient evidence was presented upon which to find that Aetna's declination of financing for East was due to the alleged conspiracy. We disagree. There was no evidence that either Aetna or Shapiro knew that First Wisconsin was Shapiro's principal. Even more telling is the fact that Aetna rejected plaintiffs' financing application one week *before* the Shapiro contact in 1969. The 1972 contact between Aetna and First Wisconsin occurred *after* foreclosure of plaintiffs' interest in the project.

Plaintiffs contend that notwithstanding the foregoing, the instruction foreclosed jury consideration of the possibility that First Wisconsin may have attempted to interfere with the proposed financing. Our reading of the careful language of the instruction is that it foreclosed consideration of the causation question only. There is no suggestion in the instruction that the jury should not consider whether First Wisconsin attempted to interfere with the financing package.

## C. *Per Se Rule*

■ The trial court refused plaintiffs' request that the jury be instructed that the use of unfair methods of competition to further a conspiracy to destroy the business of a competitor is per se violative of section one of the Sherman Act. Plaintiffs' theory is rooted in *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st Cir.), cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). The *Pick-Barth* rule, once accepted in the First Circuit, *Atlantic Heel Co. v. Allied Heel Co.*, 284 F.2d 879 (1st Cir. 1960); *but see George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), and in the Tenth Circuit, *Perryton Wholesale, Inc. v. Pioneer Distributing Co.*, 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), has never been accepted by this circuit and we decline to adopt it today. The definition of "unfair methods" is simply too amorphous a basis upon which to predicate a departure from the rule of reason. *See Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 88 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). We follow instead the mandate of the Supreme Court that such departures "be based upon demonstrable economic effect rather than upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 59, 97 S.Ct. at 2562. In view of the variety of practices—and resulting economic effects—that conceivably may be characterized as unfair methods of competition, *see Developments in the Law—Competitive Torts*, 77 Harv.L.Rev. 888 (1964), the determination whether a practice or practices challenged solely on this basis is cognizable under the Sherman Act is better left to the more particularized consideration possible under the rule of reason.

We fully concur with Judge Roney's observation in *Northwest Power Products*, 576 F.2d at 90, that "the line drawn by the *Pick-Barth* doctrine is so vague, and the circumstances in which its application manifests any injury to competition so dependent on individual facts that it does not merit the *per se* characterization some of the early cases give it." *See also Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256, 1260–62 (8th Cir. 1978). The trial judge properly refused plaintiffs' tendered instruction.

Plaintiffs raise numerous other objections to sundry jury instructions, evidentiary rulings, and to the court's conduct of the trial. We have given each of those objections thorough consideration and find none to be meritorious. In light of that consideration and the foregoing discussion, we shall affirm the jury verdict in favor of defendants in the second trial.

## IV.

Upon completion of plaintiffs' case-in-chief at the first trial, the court granted defendants' motions for directed verdicts on plaintiffs' claims under section two of the Sherman Act. In ruling on those motions, the trial court and now this court on appeal are constrained to view the evidence in the light most favorable to plaintiffs.

 It is well-established that the elements of a Sherman Act section two monopoly offense are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *see also Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 711 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). At trial, plaintiffs asserted that the relevant market was the CBD and that the product was readily available office space. The court accepted these definitions for purposes of ruling on the motions, as we do for purposes of reviewing the propriety of granting them.

Within this market, the court found, plaintiffs failed to present any proof tending to establish that defendants possessed substantial power in this market, and, therefore, plaintiffs failed to satisfy their burden on the first *Grinnell* requirement.

 Although plaintiffs now seek to place a figure next to defendants' market share, they did not seek to do so at trial. There plaintiffs asserted that establishment of a specific market share is only one way to determine whether defendants possess monopoly power, *i. e.*, the power to control prices or to exclude competition. *United States v. E. I. Du Pont De Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). That proposition is well-established in the law. *See United States v. Columbia Steel Co.*, 334 U.S. 495, 527–28, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 597–98 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Plaintiffs, however, after asserting their right to establish market power in other ways, failed to do so, which resulted in the directed verdicts.

 Plaintiffs' evidence of market power took two forms. First, they presented an expert witness who testified that he was uncertain of the power held by other lessors of office space in the CBD. Absent any indication of defendants' market share and the experts' uncertainty about the strength of defendants' competitors the trial court was quite clearly correct in preventing this speculative issue from reaching the jury. Since section two imposes liability for a monopolist's status and not necessarily his conduct, a much more rigorous showing is required. Second, plaintiffs offered a market study prepared by an organization identified only as "Urban Investment and Development Company" and submitted to the "Milwaukee Development Group." Even assuming the relevance of that 1975 study, it provides little support for plaintiffs' theory. They argue before this court for the first time that the study indicates that First Wisconsin holds a seventy percent share of the relevant market. The problem in accepting this or any figure derived from the study is that only "major"

office buildings are included. The study, however, lacks any definition of the term or any indication of the quality and quantity of office space within the relevant market that is not contained in "major" buildings. Any market share calculated on such an imprecise base is simply too speculative to reach the jury.[17]

### V.

We have considered and rejected as lacking merit the remaining assertions of error that plaintiffs raise. For all of the foregoing reasons, the judgment of the district court in favor of defendants is affirmed.

Affirmed.

---

**17.** The trial court also granted directed verdicts against plaintiffs under section two of the Sherman Act on their attempt to monopolize and conspiracy to monopolize claims. As to the attempt claim, the absence of evidence on First Wisconsin's market share also makes consideration of its likelihood of success, *see Photovest Corp. v. Fotomat Corp.*, 606 F.2d at 711, a highly speculative venture and one the court properly kept from the jury. Plaintiffs were not prejudiced by the directed verdict on the conspiracy to monopolize claim. A conspiracy to monopolize would necessarily constitute a conspiracy in restraint of trade under section one of the Sherman Act. Plaintiffs were free in the second trial to prove a conspiracy in restraint of trade and were not precluded from presenting any evidence as a result of the directed verdict. Moreover, the jury could not have found a conspiracy to monopolize while finding, as it did, that there was no conspiracy in restraint of trade.